**Rev. E.K. HALL, Sr. et al., Plaintiffs,**

**v.**

**Jackie HOLDER, et al., Defendants.**

**Civ. A. No. 85–242–2–MAC (WDO).**

United States District Court,
M.D. Georgia,
Macon Division.

March 7, 1991.

Christopher Coates, Milledgeville, Ga., Laughlin McDonald, Neil Bradley, Atlanta, Ga., for plaintiffs.

R. Napier Murphey, Cubbedge Snow, Jr., Martin, Snow, Grant & Napier, Macon Ga., W. Lonnie Barlow, Arnold & Barlow, Cochran, Ga., for defendants Jackie Holder and Robert Johnson.

## ORDER

OWENS, Chief Judge.

In this civil action plaintiffs contend that Bleckley County's single county commissioner form of county government, which was established when the county was created in 1912 and has continued without change, violates the Constitution of the United States and Section 2 of the Voting Rights Act.[1]

Plaintiffs are six black Bleckley County registered voters and the Cochran/Bleckley County Chapter of the National Association for the Advancement of Colored People. Defendants are Commissioner Jackie Holder, the incumbent sole county commissioner, and Probate Judge Robert Johnson who also serves as superintendent of elections. O.C.G.A. § 21-2-70.

Plaintiffs contend that Bleckley County should have more than one county commis-

sioner, that each commissioner should be elected from and by the voters of a single member district, and that the black population resides in a contiguous area so that a safe black single member district can be created to give black citizens the opportunity to participate in the electoral process and to elect one or more county commissioners of their choice.

Following extensive discovery, a non-jury hearing was held on December 4-7, 1989. Thereafter the hearing was transcribed and the parties in May, 1990, submitted lengthy, detailed proposed findings of fact and conclusions of law. All having been considered, the following constitutes the court's findings of fact and conclusion of law. Rule 52(a), Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. Bleckley County, one of Georgia's 159 counties, was created by an amendment to Georgia's constitution in 1912. Its territory came from what was then Pulaski County. The amendment provided for a county government of one elected county commissioner. 1912 Ga.Laws 38. The state legislature in 1913 implemented the amendment and appointed the county's first commissioner to serve until his successor was elected and qualified. 1913 Ga. Laws 345.

2. Bleckley County encompasses some 219 square miles and is situated in rural Middle Georgia about 40 miles southeast of Macon.

3. From its creation in 1912 until today, Bleckley County has never varied from its present form of county government—one elected county commissioner. The powers and duties of the county government, also referred to as "the governing authority," are as specified by general state law, see

---

1. This civil action was originally filed on July 17, 1985, under the Constitution and the Voting Rights Act, 42 U.S.C. § 1973, challenging (1) the method of electing the members of the Cochran City Council, (2) the district voting plan for members of the Bleckley County Board of Edu-

cation, and (3) the sole commissioner form of county government. Plaintiffs' claims against the City of Cochran and the Board of Education were settled and a consent order was entered, leaving just this claim to be resolved.

O.C.G.A. § 36–5–22.1, applicable to all 159 counties without regard to the number of county commissioners each county may have. Bleckley County's sole county commissioner thus exercises all the powers and duties of the governing authority of Bleckley County.

4. The sole county commissioner form of county government is not unique to Bleckley County. Some 20 other Georgia counties have sole county commissioner forms of county government. See *The Macon Telegraph and News*, July 6, 1990.

5. In addition to having only one county commissioner, Bleckley County also has only one Sheriff, Probate Judge, Clerk of Superior Court, Tax Commissioner, Coroner, School Superintendent, County Surveyor and Magistrate, each of whom is elected by all the voters of Bleckley County.

6. According to the 1980 Census of Population, Bleckley County's total population was 10,767, having the following characteristics:

| (a) | By Race | – | Total Population |
|---|---|---|---|
| | Black | 2,367 | 22% |
| | White | 8,297 | 77% |
| | Other | 103 | 1% |
| | Total | 10,767 | 100% |

| (b) | By Race | – | Voting Age Population |
|---|---|---|---|
| | Black | 1,474 | 19% |
| | White | 6,175 | 80% |
| | Other | 70 | 1% |
| | Total | 7,719 | 100% |

7. At the time Bleckley County was created in 1912 and 1913 very few blacks, if any, could vote. There was no evidence presented at trial to suggest that the specific act of creating Bleckley County's single member commission belied a racial motivation on the part of the Georgia Legislature. The sole commissioner form of government was not specifically selected for the purpose of further depriving already deprived blacks of the opportunity to vote or participate in the political process. The evidence does not show why the legislature chose the sole commissioner form of government.

8. Until the Civil Rights Acts of 1957, 1960, 1964 and 1968 were passed by Congress and enforced by federal authorities, Bleckley County, in common with state and local government throughout much of the United States, enforced racial segregation in all aspects of local government—courthouse, jails, public housing, governmental services—and deprived its black citizens of the opportunity to participate in local government. After the Civil Rights Acts, segregation ended and is today no longer imposed by government.

9. *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1953) and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1954) ordered an end to segregated public schools. From the 1950's until around 1970, there was great public debate and discussion of desegregation, not just of public schools but of all public places. Candidates for public office during those years appealed for voter support by promising to oppose desegregation, but that practice ceased in the mid to late 1960's in Georgia and Bleckley County.[2]

10. The 1980 census and the well-founded opinions of plaintiffs' experts, Dr. Willingham and Dr. Engstrom, show conclusively that more black than white residents of Bleckley County continue to endure a depressed socio-economic status. This conclusion is mandated by census data showing, among other things, that: (1) 50% of the whites in Bleckley County have a high school education while less than 15% of the blacks have a high school education; (2) whites are more likely than blacks to own automobiles and have telephones; (3) the per capita income and median family in-

**2.** Plaintiff Walker, President of the Bleckley County NAACP, testified that he was unaware of any open racial appeals in recent elections in Bleckley County.

come of whites is double that of blacks; and (4) while one-third of the blacks live below the federally recognized poverty level, only 9% of the whites do. This depressed socio-economic status hinders the ability of blacks to participate in the Bleckley County political process because, as Dr. Willingham opined: (1) better educated people are less threatened by having to make choices and are more likely to understand the importance of civic involvement; and (2) less educated people are more difficult to mobilize to vote even if they are registered to do so.

11. The depressed socio-economic status of black residents, including particularly the lack of public or private transportation, telephones and self-employment, hinders the ability of and deters black residents of Bleckley County from running for public office, voting and otherwise participating in the political process.[3]

12. Local government is not responsible for arranging engagements for candidates for public office to speak to or be exposed to the voters of Bleckley County and is, therefore, not the cause of candidates having or not having the opportunity to be exposed to the members of church, civic or social groups. Churches, civic clubs and other social groups in Bleckley County—as in most of the United States—are generally racially and/or sexually exclusive, not because of state or local government but as the result of the personal preferences of the membership.

13. Until the Voting Rights Act of 1965 was passed by Congress, black citizens were virtually prohibited from registering to vote in Bleckley County. Before the 1965 Voting Rights Act, 3,346 of the 4,528 voting age Bleckley County whites were registered to vote, but only 45 of the 1,380 voting age non-whites were registered. Immediately after the Voting Rights Act of 1965 Act passed white registration increased from 3,346 to 4,756 and non-white

increased 600% from 45 to 287. (Plaintiff Exhibit 388). Since then, black voter registration has steadily increased so that today about 70% of the black voting age population is registered to vote—about the same as for today's white voting age population. (Defendant Exhibits 10–19).

14. In 1984, for the first time, black deputy voting registrars were appointed in Bleckley County, and black citizens were permitted to register in places where blacks normally congregate, such as the black Masonic lodge.

15. From 1978 to 1986, the defendant probate judge as the superintendent of county elections appointed 224 poll managers for some 17 elections; all of those appointed were white persons. He also appointed 509 poll clerks, only 30 of whom were not white. The probate judge's failure to appoint more minorities as poll managers and clerks is the subject of an unresolved lawsuit in this court. *NAACP of Cochran/Bleckley County, et al. v. Bleckley County, et al.*, 88–32–MAC (WDO). The evidence does not show that this practice has deterred blacks from voting.

16. While the legislature of this state has never altered Bleckley County's sole commissioner form of county government, the legislature in 1985 did submit to the voters of Bleckley County by referendum the question of whether or not Bleckley County should have a county commission of six county commissioners. 1985 Ga. Laws 4406. So limited was the electorate's interest in the referendum that only 25% of the eligible voters expressed any opinion with regard to the desirability of the proposed change. By a vote of 1,156 to 887, the voters on November 4, 1986, voted against a six commissioner commission. The voters did not perceive the referendum to be a black versus white issue and the

---

**3.** The barriers to active participation in the political process are today compounded by the fact that Bleckley County now has only one voting precinct for the entire 219 square-mile area.

vote was not racially polarized.[4]

17. Neither the direct nor the circumstantial evidence shows that the sole commissioner form of government has been retained from 1912 until today for any particular purpose, racial or otherwise. The evidence does not show that the 1986 referendum was authorized for racial reasons; rather, local citizens, dissatisfied with *ad valorem* tax increases authorized by the sole commissioner who has the responsibility of settling *ad valorem* tax rates, generated the political influence that caused the legislature to authorize the referendum.

18. The evidence does not show that the sole commission form of government for Bleckley County has been retained for tenuous reasons. Defendant's expert testified that the citizens of Bleckley County rejected the referendum and preferred the single member commission because it is less expensive and satisfactorily responsive to the county's small size and population. In a January 25, 1984, article from *The Cochran Journal*, Councilman Basby stated in reference to whether the county should abandon the sole commissioner system, "[l]arger counties obviously need a commission, but one person could be good for small counties if he's an active man and deals with all the people." (Plaintiffs' Exhibit 41). Plaintiffs do not claim nor does the evidence show that defendant Holder or the county commissioner's office, as structured, are unresponsive to the particularized needs of the black community in Bleckley County.

19. Until the Georgia legislature in 1964 enacted a state election code uniformly proscribing how all primary and general elections held in this state were to be conducted, primary elections were conducted by state and local political parties pursuant to rules adopted by each state or local party and at times selected by each state or local party. Under this system in Bleckley County primary elections a plurality of all votes cast determined the winner in most years; in some years a majority of all votes cast determined the winner. Immediately before adoption of the election code, the state and county democratic committees adopted a majority vote requirement. At that time many officials of this state expressed great concern over an emerging black vote.[5]

20. The state election code of 1964 required a majority vote for all state and county elections in this state.[6] Because of this general requirement Bleckley County's sole commissioner, like all public officials, is elected by majority vote. Whether the state-wide majority vote requirement violates the Voting Rights Act, any other law or the Constitution is the subject of a lawsuit pending in the Northern District of Georgia.

21. No black candidate has ever run in a primary or general election for sole commissioner of Bleckley County.

22. The evidence does not show that any candidate slating process exists in Bleckley County.

23. Prior to the election of school board members from single member districts and

---

4. Councilman Willie Basby, a black citizen and the councilman from Cochran's majority black city council district, testified as follows:
   Q: Mr. Basby, were you familiar with the 1986 referendum in Bleckley County to change the form of government?
   A: Right.
   Q: Was there any black interest, so to speak, any organized interest in the black community in that referendum?
   A: I think so, but it was on a—it was very small.
   Q: Was there any organized effort in the black community with regard to that refer-

endum to vote one way or the other, any meetings?
   A: Yes, it was (sic), but it was a small percentage of participation.
   (Transcript pp. 320–21).

5. One such legislator, Floor Leader Frank Twitty, warned the Georgia House that without legislation district elections in Fulton County would inevitably lead to the election of a negro. (Plaintiffs' Exhibit 228).

6. O.C.G.A. § 21-2-501.

the election in 1986 of Reverend Hall, a black who ran against a black in a majority black district, only one black had ever run for a county-wide office—in 1984 Reverend Hall unsuccessfully opposed incumbent Robert Johnson for probate judge.

24. If the county commission were increased in number to six commissioners to be elected from five single member districts and if the districts were the same as the present school board election districts, a black majority "safe" district—the same district Reverend Hall was elected from—would result.

25. Neither the plaintiffs nor the defendants produced data showing a relationship between the race of Bleckley County voters—white or black—in election contests for county offices and the way in which the voters voted; such data is simply not available. Instead, they each rely upon the success and/or failure of white and black candidates in attracting the votes of Bleckley County voters in other than county office elections.

Lester Maddox, an avowed racist, ran for governor in 1964 as a Democrat against Republican Howard H. "Bo" Callaway. Bleckley countians voted 1,906 for Maddox, 870 for Callaway and 25 write-ins for Arnall. In 1974, J.B. Stoner, also an avowed white racist, ran for Lt. Governor in the state-wide Democratic primary election and in Bleckley County got around 20% of the total county vote compared to 9% of the total state vote. The evidence does not show how many whites or blacks voted for Mr. Stoner or Mr. Maddox.

In 1984, when Bleckley County had eight election precincts, Jesse Jackson ran in the Democratic presidential preference primary. In Bleckley County and statewide, the results were:[7]

## DEMOCRATIC PRESIDENTIAL PREFERENCE PRIMARY

| Candidate: | Bleckley County Vote: | | State Vote: | |
|---|---|---|---|---|
| Askew | 1 | .05% | 1,660 | .24% |
| Cranston | 4 | .24 | 923 | .13 |
| Glenn | 324 | 19.30 | 122,744 | 17.93 |
| Hart | 529 | 31.60 | 186,903 | 27.30 |
| Hollings | 19 | 1.14 | 3,800 | .56 |
| Jackson | 150 | 8.90 | 143,730 | 21.00 |
| McGovern | 46 | 2.80 | 11,321 | 1.65 |
| Mondale | 583 | 34.80 | 208,588 | 30.47 |
| Willis | 6 | .36 | 1,804 | .26 |
| Uncommitted | 9 | .54 | 3,068 | .45 |
| Total | 1,671 | | Total 684,541 | |

## REPUBLICAN PRESIDENTIAL PREFERENCE PRIMARY

| | | |
|---|---|---|
| Reagan | 87 | 50,793 |

7. See Court Exhibit 1, Secretary of State's Election Report.

A homogenous precinct and bivarate regression analysis of the 1984 presidential preference primary election in Bleckley County shows that Jesse Jackson received some 60.8% of the black vote and some 0.9% of the white vote.

In 1984, there were 958 registered black voters and 4,549 registered white voters in Bleckley County. In addition, there were 140 registered voters of other races. The evidence does not show why only 1,671 of the 5,647 registered voters went to the polls.

Reverend Jackson again ran in the 1988 Presidential Preference Primary. In the interim between 1984 and 1988 Bleckley County elections were consolidated into one voting precinct. A regression analysis of the type conducted with regard to the 1984 election was no longer possible. However, the court takes judicial notice of the official election results offered by neither plaintiffs nor defendants which show the following breakdown of votes case in that primary: [8]

## DEMOCRATIC PRESIDENTIAL PREFERENCE PRIMARY

| Candidate: | Bleckley County Vote: | | State Vote: | |
|---|---|---|---|---|
| Babbitt | 28 | 1.58% | 3,247 | 0.52% |
| Dukasis | 210 | 11.82 | 97,179 | 15.61 |
| Gephardt | 202 | 11.37 | 41,489 | 6.66 |
| Gore | 933 | 52.50 | 201,490 | 32.36 |
| Hart | 109 | 6.13 | 15,852 | 2.55 |
| Jackson | 250 | 14.07 | 247,831 | 39.80 |
| Simon | 13 | 0.73 | 8,388 | 1.35 |
| Uncommitted | 32 | 1.80 | 7,276 | 1.17 |
| Total | 1,777 | Total | 622,752 | |

## REPUBLICAN PRESIDENTIAL PREFERENCE PRIMARY

| | | | | |
|---|---|---|---|---|
| Bush | 345 | 44.06% | 215,516 | 53.75% |
| Dole | 245 | 31.29 | 94,749 | 23.63 |
| DuPont | 2 | 0.26 | 1,309 | 0.33 |
| Haig | 3 | 0.38 | 782 | 0.20 |
| Kemp | 47 | 6.00 | 23,409 | 5.84 |
| Robertson | 141 | 18.01 | 65,163 | 16.25 |
| Total | 783 | Total | 400,928 | |

In 1988, there were 4,225 registered white voters and 1,024 registered black voters in Bleckley County.

In 1988, an exit poll was conducted at the direction of plaintiffs' expert, Dr. Willingham, at Bleckley County's sole voting precinct.[9] The poll, labelled a "sample ballot," unlike the actual ballots used in the primary simply listed the slated candidates for president from *both* political parties.[10] In

---

**8.** See Court Exhibit 2, Secretary of State's Election Report.

**9.** Dr. Willingham was not present at the polling place, and so was unable to answer from personal knowledge defense counsel's questions with regard to whether the exit poll was executed based upon random sampling techniques and as to what approach was used by those distributing the poll.

**10.** The court also notes that despite the fact that the sample ballot listed the names of the presidential candidates, it instructed voters "Please

addition to a section which identified the Southern Regional Council, of which Dr. Willingham was a member, as an independent group taking the poll and instructions on how to fill out the sample ballot, the sample ballot included the following question:

## VOTER SURVEY

Please check or mark the appropriate boxes below and fill in the blank space.

Race: ○ White ○ Black

Sex: ○ Male ○ Female

_____ years old.

Do you believe voters tend to vote along racial lines in Bleckley County elections?

○ Yes ○ No

(Plaintiffs' Exhibit 390).[11] The exit poll was supervised by Miss Chris Carrea, who did not testify at the trial.

Dr. Willingham testified that pollsters were instructed to attempt to distribute the sample ballots to as many voters as they could. According to Plaintiffs' document "Results of the Exit Poll at a Glance," (Plaintiffs' Exhibit 390), 993 voters responded to the poll; their preferences broken down as follows:

### REPUBLICANS

| | |
|---|---|
| George Bush | 119 |
| Bob Dole | 86 |
| Pete du Pont | 1 |
| Alexander M. Haig | 0 |
| Jack Kemp | 19 |
| Pat Robertson | 68 |

### DEMOCRATS

| | |
|---|---|
| Bruce Babbitt | 3 |
| Michael Dukakis | 81 |
| Dick Gephardt | 51 |
| Albert Gore | 319 |
| Gary Hart | 39 |
| Jesse Jackson | 161 |
| Paul Simon | 2 |
| Uncommitted Preference | 12 |
| Declined to Answer | 20 |
| Marked Two Candidates | 12 [12] |

The exhibit also includes a breakdown of expressed preferences by voter race. Of the 161 voters preferring Jesse Jackson, 145 were black, 11 were white, and 5 were of a race other than black or white. In sum, of those who expressed a preference, 1.3% of whites, 92.3% of blacks, and 17.8% of other races supported Jesse Jackson.

In 1988, all voters voted in one precinct in Bleckley County. In the absence of multi-precinct data a bivarate regression analysis could not be performed. The exit poll, however, does indicate that Jesse Jackson was again the choice of most black Bleckley County voters and not the choice of most white voters.

The City of Cochran is in Bleckley County. In 1980, it had 5,121 residents of whom 1,704 were black (33%). Until 1986 and the division of the City into single member districts, one of which was 73% black, only one black—Willie Basby—had been elected at-large by plurality vote of the voters of Cochran. Other blacks—David Walker and Mattie McDonald—ran at-large for city council and lost.

check or mark the names of those for whom you voted in the regular *Mayor/Council election* on the sample ballot." (Plaintiffs' Exhibit 390) (emphasis added).

11. The parties do not reference this portion of the exit poll in their respective briefs and the court gives no credence to any evidence which might have been drawn from a question eliciting a legal opinion from Bleckley County voters.

12. The "uncommitted preference" was one of the choices on the sample ballot; plaintiffs listed these responses separate from those who simply refused to fill out a sample ballot. The court also notes that the exhibit which plaintiffs' counsel identified as the breakdown for votes county-wide is headed "(Cochran)." Because the votes set out on this exhibit equal the total number of voters responding, 993, the court assumes that this document, indeed, reflects exit poll responses for all of Bleckley County's voters who responded.

Basby attracted the following votes against the following white candidates:

| 1972 | Crooms (W) | 688 |
| | Basby (B) | 439–Lost |
| 1973 | Dixon (W) | 249 |
| | Lucas (W) | 177 |
| | Basby (B) | 277–Won |
| 1975 | Greer (W) | 405 |
| | Basby (B) | 379–Lost |
| 1977 | Giddings (W) | 403 |
| | Tomberlin (W) | 55 |
| | Basby (B) | 467–Won |
| 1979 | Justice (W) | 228 |
| | Basby (B) | 521–Won |

1981 to date—Basby—unopposed

Judge Benham, an incumbent black Georgia Court of Appeals judge, carried Bleckley County in a recent election. In past elections other black candidates—C.B. King in 1972; Mildred Glover in 1982; and, Otis Smith in 1988—for state-wide offices received very few votes in both Bleckley County and state-wide.

After the City was divided into single member districts, Reverend Roberson, a black citizen, ran for city council against a white opponent. In the district there are some 300 white (27%) and 800 black (73%) registered voters. Reverend Roberson won 492 (84%) to 96 (16%).

26. No credible evidence was available to estimate support for most of these candidates from the black and white communities, respectively. From these facts it is apparent that from time to time black and white voters prefer different candidates, but the evidence is insufficient to demonstrate and this court cannot find that there is a consistent relationship between the race of Bleckley County voters and the way—for whom—they vote.

The opinions of the experts to the contrary are not accepted. They are based upon insufficient data and upon their preconceived notions that voters in Bleckley County, like voters all over this Nation, when presented with black and white candidates choose a candidate of their own race. (Tr. pp. 384, 434).

## DISCUSSION

Section 2 of the Voting Rights Act of 1965, as amended June 29, 1982 ("the Act"), 42 U.S.C. § 1973, *et seq.*, affords a remedy to plaintiffs who successfully demonstrate an inequality traceable to a particular law, practice, or structure based either upon a discriminatory intent in its original or continued implementation or upon proof that the law, practice, or structure results in denial or abridgment of any member of a protected class' right to vote. *Thornburg v. Gingles*, 478 U.S. 30, 43, 106 S.Ct. 2752, 2762, 92 L.Ed.2d 25, 42 (1986). The Act provides in part:

(b) A violation of [the Act] is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by [the Act] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of the protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b).

The court will first address plaintiffs' claims arguing that the single county commissioner form of government was enacted and has been maintained in Bleckley County with the intent to preclude members of the black community from enjoying equal access to the political process. The court will then analyze the relevant evidence with regard to whether Bleckley County's single commissioner form of government does, in fact, result in an abridgment to equal participation by the black community.

## I. CONSTITUTIONAL CHALLENGE

■ This court first notes that even those cases which have led to the development of the discriminatory results test and those employing the results analysis, addressed *infra*, have drawn upon a wealth of evidence of past discrimination as well as evidence of electoral returns which demonstrated that the challenged practice or procedure worked to perpetuate past discrimination. Plaintiffs' suggestion that Georgia politics has seen the rise and fall of many racist politicians without more cannot amount to evidence that a particular enactment is tainted with racial animus. *See Vereen v. Ben Hill County,* 743 F.Supp. 864, 869 (M.D.Ga.1990) (citing *Hunter v. Underwood,* 471 U.S. 222, 233, 105 S.Ct. 1916, 1922, 85 L.Ed.2d 222, 231 (1985)). To prevail upon its specific claims that the single member county commission was enacted or has been maintained based upon an intent to exclude or limit the influence of the black community, plaintiffs must present the court with greater evidence than a conglomeration of newspaper clippings from Georgia newspapers and local resident reminiscences of this state's struggle to cast off the bonds of segregation. Plaintiffs must present credible evidence either that the Georgia Legislature had a discriminatory purpose in creating Bleckley County's single member commission or credible evidence that the single member commission has been maintained to effectuate a discriminatory purpose. This they have not done.

*Carrollton Branch of NAACP v. Stallings,* 829 F.2d 1547, 1550 (11th Cir.1987), *cert. denied sub nom., Duncan v. Carrollton,* 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988), provides an example of the type of evidence required to demonstrate a racial motivation behind a particular enactment. In *Stallings,* the Eleventh Circuit emphasized the importance of the plaintiffs' historical evidence that defendant Carroll County had in 1947 sought to *re-establish* a one person commission. Representative Willis Smith of Carroll County, in a speech to the Georgia Assembly favoring the reinstatement of single member commission in Carroll County, stated:

> Georgia is in trouble with the Negroes unless this bill is passed. This is white man's country and we must keep it that way.

*Stallings,* 829 F.2d at 1551.

There is no evidence in the record to demonstrate that the creation of Bleckley County or its single member commission in 1912–13 stemmed from a racial or discriminatory motivation. Unlike Carroll County in *Stallings,* Bleckley County's single member commission has been the exclusive form of government since the county's inception. Plaintiffs have put forward neither evidence of lobbying of the type found in *Stallings,* nor any similar evidence in support of a claim that the creation or maintenance of the single member commission in Bleckley County evidences intend to discriminate. The charter of Bleckley County and the creation of its single member commission were not proven to be the product of a specific, or even general, racial motivation.

Plaintiff's expert, Dr. McCrary, testified that in his research pertaining to the years 1946–1964 he found no articulation of a racial purpose for the maintenance of the sole commissioner form of government in Bleckley County. The court finds this particularly significant given the wealth of evidence presented by plaintiffs which suggests that racial views and motives, where felt, were topics of open expression during this time period. The open expression of racist sentiments was reflected in various newspaper articles such as *Valdosta Daily Times* articles quoting various legislators in 1962.[13] Whether or not the system in Bleckley County was maintained for such a purpose or not is a matter of the purist speculation. Without specific evidence that the system was maintained to effectuate an intent to dilute minority participation, plaintiffs' claim must necessarily fail.

At trial, the only evidence with regard to more recent elections and politics in Bleckley County addressed the lack of open racial issues or appeals in those elections and the 1986 referendum on the proposal to abdicate the single member commission.[14] The 1986 referendum was rejected and the single member commission retained by a majority of the votes cast (the vote was 1,156 to 887). 1987 Ga.Laws CCLXXII. So limited was the electorate's interest in altering the commission's structure, that only approximately 25% of the eligible voters expressed any opinion with regard to the desirability of the proposed change. The Bleckley County Grand Jury recommended the referendum because of dissatisfaction in the county with a recent tax increase. Defendant's expert, Dr. Loftin, testified that in her personal opinion, as a historian and resident of Bleckley County since 1969, the citizens of Bleckley County rejected the referendum and preferred the single member commission because it is less expensive and satisfactorily responsive to the county's small size and population.[15]

The testimony of Councilman Basby at trial further demonstrates that others in the black community, when presented with an opportunity to express an opinion on the proposed change in the commission size, may have shared his sentiments. *See* n. 3, *supra.* While the overall disinterest in the referendum is not grounds to disregard plaintiffs' arguments favoring an enlarged commission, the limited response and Councilman Basby's opinions do suggest a variety of viewpoints within the black community with regard to the attractiveness of a multi-member commission.

The underwhelming response of Bleckley County voters to the referendum coupled with the lack of evidence from either plaintiffs or defendants to demonstrate that race played even a minor role in the referendum campaign indicates a general perception in the community that the referendum results were the product, not of racial motivations, but of a generally held perception favoring a vote against expanding the size of the government: a sentiment which knows no racial barriers. This court has heard no credible evidence to support plaintiffs' arguments that the referendum itself evidences the alleged discriminatory purpose to maintain the county commission in its present form.

Plaintiffs also complain that the majority vote requirement used in Georgia to govern primary elections was implemented and has been maintained for the purpose of diluting minority voting. There was no evidence presented at trial to suggest that Bleckley County exercised any control over the implementation of the majority vote requirement. Again, the issue of whether the state-wide majority vote requirement vio-

13. *See, e.g.,* n. 5, *supra.*

14. *See* n. 2, *supra.* The exception, of course, would be the presidential campaign of the Reverend Jesse Jackson. *See* n. 29, *infra.*

15. See FACTS, ¶ 18, *supra.*

lates the Voting Rights Act, any other law or the Constitution is the subject of the above referenced case in the Northern District of Georgia. This issue is not properly before the court in the case *sub judice*.

The evidence presented at trial and history demonstrate that no county has ever itself exercised control over the electoral process. County elections have long been subject to the whims and control of the Georgia Legislature. *See, e.g., Vereen*, 743 F.Supp. at 866–67, n. 4 (1872 Georgia Legislature, concerned about black gains in political power, simply abolished elections for county commissioner in majority black McIntosh County). The term "maintenance" suggests a power to dismantle if the authorized body so chooses; in the case *sub judice*, Bleckley County had neither the power nor the authority to alter the majority vote requirement. Whether or not the county might have been inclined to abandon the system or tacitly approved of it is a matter of speculation and has no bearing upon the plaintiffs' claims.

While the facts that racism and segregation are part of the history of the South and the nation, and that these are problems yet subject to full redress nationwide, are not matters subject to quibbling, this court cannot, based simply upon the existence of racial tensions in this country, charge every piece of legislation and every political process carried out with being specifically tainted by discriminatory intent. Plaintiffs in the case *sub judice* have failed to provide any evidence that Bleckley County's single member county commission is the product of original or continued racial animus or discriminatory intent.

## II. DISCRIMINATORY RESULTS

■ The essence of a vote dilution claim such as the one remaining before the court is that the identified electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives. *Thornburg v. Gingles*, 478 U.S. 30, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25, 44 (1986).[16]

■ In *Gingles*, the Supreme Court set forth the manner in which a trial court should evaluate a § 2 results claim. The Court set out both the analysis formulated by Congress and a new three part test for analyzing vote dilution claims under Section 2 of the Act. *Gingles*, 478 U.S. at 37–38, 48–51, 106 S.Ct. at 2759, 2765–67; *see also Stallings*, 829 F.2d at 1550 (the *Gingles* test focuses on the existence of a politically cohesive geographically insular minority group and voting along racial lines as necessary preconditions to successful voting impairment claims).[17] The necessary preconditions are:

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single member district;[18]

Second, the minority group must be able to show that it is politically cohesive; and[19]

Third, the minority must be able to demonstrate that the white majority votes

---

**16.** The intent test of the Act is concentric with the analysis of the Constitutional grounds for recovery asserted by plaintiffs. It is the unconstitutional motivation in enacting or maintaining the system which amounts to a violation. Evidence of racial intent has been considered as one complete analysis, *supra.*

**17.** The *Stallings* case is, again, of particular interest to this court as it involved a challenge to Carroll County's single member commission form of government.

**18.** In the case *sub judice* plaintiffs argue that if the existing single member commission were enlarged to three or more members, each representing a separate district, the black community is sufficiently geographically compact to constitute a majority in such a district.

**19.** The similarities between racial bloc voting and this second tier of analysis can be seen in

sufficiently—in the absence of special circumstances, such as the minority candidate running unopposed, ...—usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 48–51, 106 S.Ct. at 2765–67 (*citing* Blacksher & Menefee, From *Reynolds v. Sims* to *City of Mobile v. Bolden*, 34 Hastings Law Journal 1 (1982)).

Senate opponents to the 1982 amendment to the Act expressed fears that a change in the Voting Rights legislation would lead to "a requirement of racial quotas, or an all-out assault on at-large election systems in general." S.Rep. 97–417 at 27, U.S.Code Cong. & Admin.News 1982, pp. 177, 205. To insure that this result did not obtain, the Act includes the following language:

*Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

the *Stallings* court's statement in dicta that "proof of racial polarization may, of course, be found sufficient by this Court to make the necessary finding of cohesiveness." *Stallings,* 829 F.2d at 1563; *But see Concerned Citizens of Hardee County v. Hardee County Board of Commissioners,* 906 F.2d 524, 526–27 (11th Cir.1990) (despite proof of bloc voting by whites, class failed to prove political cohesiveness of black and hispanic voters in jurisdiction).

**20.** The Senate Report lists the "typical" factors to be considered as follows:

"1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register to vote, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

42 U.S.C. § 1973(b). As an additional barrier to unattractive, mechanical results such as quotas, the Senate left to the trial court the latitude to consider a variety of factors. S.Rep. at 28.[20] The Senate Committee specifically stated:

The courts ordinarily have not used these factors, nor does the Committee intend them to be used as a mechanical 'point counting' device ... Rather, the provision requires the court's overall judgement, based on the totality of the circumstances and guided by those relevant factors in the particular case ...

*Id.* at 29 n. 118,[21] U.S.Code Cong. & Admin. News 1982, p. 207 n. 118.

■ Section 2 protects the right of minority voters to be free from election practices which deny them the *same* opportunity to participate in the political process as other citizens enjoy, S.Rep. at 28 (emphasis added); it does not mandate proportional

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;
7. the extent to which members of the minority group have been elected to public office in the jurisdiction." S.Rep. No. 417 at 28–29, U.S.Code Cong. & Admin.News 1982, pp. 206, 207.
The Senate Report also lists the following as additional relevant factors:

"whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;" and
"whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Id.*

**21.** *See also Solomon v. Liberty County,* 899 F.2d 1012, 1033 (Tjoflat, specially concurring) ("[T]he primary objection in the Subcommittee on the Constitution to the House bill was the perceived lack of a threshold requirement to the results

percentage representation by race. Obviously, then, a successful claim is contingent upon evidence that it is, indeed, the practice to which an objection is raised that works to deny minorities that equal access. "The ultimate determination of vote dilution is a question of fact to be resolved under the totality of the circumstances." *Solomon*, 899 F.2d at 1015–16, n. 6. (Kravitch, concurring specially) (*citing Gingles*, 478 U.S. at 79, 106 S.Ct. at 2781). The *Gingles* test and the Senate Factors from which it was drawn ensure that a successful vote dilution claim must be based upon nothing less than evidence that, because of its submergence in a predominately white district, a geographically compact, politically unified minority electorate's choices at the polls are impeded and defeated by the voting scheme. *Stallings*, 829 F.2d at 1563; *Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766–67.

### A. Applying the *Gingles* Test

#### 1) Racial Bloc Voting

The plaintiffs do not present evidence of local office elections where black candidates or candidates harnessing the support of the black community suffered defeat attributable to the votes cast by a white or majority voting bloc. The present claim is not based upon statistical evidence of polarized voting in elections for local office.[22]

In fact, the most pronounced evidence *offered by plaintiffs* with regard to a local election involving at-large voting amounts to an electoral anthology of the triumphs of Cochran City Councilman Willie Basby ("Councilman Basby"), a black citizen appearing as a witness for the plaintiffs.

Plaintiffs state that given the racial demographics of Bleckley County, "it would be necessary for a candidate, whether he or she be black or white, who is supported by black voters to receive substantial white voter support in order to win a sole commissioner race." (Plaintiffs' Proposed Findings of Fact ¶ 16). Indeed, Councilman Basby stated:

> "... a small town in Georgia (Cochran), you have to be known by blacks and whites to get elected for public office; therefore, you need a percentage of all black and white to get elected." (Transcript p. 312)[23]

Basby, a veteran of local elections dating back to the early 1970's, went on to say that personal contact is the most important aspect of running for elections in Cochran and Bleckley County. (Transcript pp. 312–13).

It appears that the testimony of Councilman Basby serves less as evidence of racially polarized voting and more as a lesson in the dynamics of grass roots political

---

test. Without such a requirement, the Subcommittee members feared, a plaintiff could mechanically prove one objective factor and win under the new language, not leaving the defendant any opportunity to rebut the plaintiffs' case") (*citing* Subcomm. on the Constitution to the Senate Comm. on the Judiciary, Voting Rights Act: Report of the Subcommittee on the Constitution, *appended to* S.Rep. No. 417, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code & Admin.News 278, 309).

This court is mindful that in cases where a plaintiff can show that an electoral scheme was purposefully adopted or maintained to weaken a minority group's political influence, a test less stringent than *Gingles* might apply. *See Solomon*, 899 F.2d at 1017, n. 5 (Kravitch, specially concurring). Given this court's determination that plaintiffs have failed to demonstrate discriminatory intent, any such less stringent test need not be considered here.

**22.** The court does note the plaintiffs' contention that the county's decision to consolidate the separate voting precincts into one county-wide voting precinct has resulted in difficulty in analyzing the racial composition of voting in the county. The court does not mean to suggest that plaintiffs have failed to present all available evidence, the court simply agrees with plaintiffs' expert, Dr. Willingham, that this case involves a "paucity of statistical information regarding racial bloc voting" in Bleckley County. (Transcript p. 357).

**23.** The court takes into account Councilman Basby's further statement "in the City of Cochran has began to work better, but now, when you're talking about at-large in the County election, it's different because you got more people to deal with." (Transcript p. 320).

campaigning. Nothing in the plaintiffs' evidence drawn from elections for local office leads this court to a conclusion that voting on local levels is racially polarized.[24]

### Exogenous Elections

Plaintiffs, conceding that Reverend Hall is the only black candidate to have run for county office, premise their arguments that racial bloc voting infects the electoral process in Bleckley County upon evidence drawn principally from statistical analysis of the 1984 and 1988 Democratic Presidential Primaries, specifically the campaigns of the Reverend Jesse Jackson, and an exit poll conducted during the 1988 election.

Of course, the fact that plaintiffs' evidence in this area relates only to exogenous elections does not doom their case. *See Gingles*, 478 U.S. at 57 n. 25, 106 S.Ct. at 2770 n. 25 ("Where a minority group has never been able to sponsor a candidate, plaintiffs could rely on other factors that tend to prove unequal access to the electoral process"); *see also Westwego Citizens for Better Government v. Westwego*, 872 F.2d 1201, 1209 n. 8 (5th Cir.1989) ("[P]laintiffs may not be denied relief simply because the absence of black candidates has created a sparsity of data on racially polarized voting in purely indigenous elections.") The *Gingles* Court envisioned circumstances where a trial court would be called upon to engage in analysis beyond mere observation of the statistical data compiled from local office elections.

■ Prior to the *Gingles* decision, the Eleventh Circuit, in applying the Senate factors, specifically held that the fact that no black has run for the particular office does not *per se* weaken a claim under the Act. *See McMillan v. Escambia County*, 748 F.2d 1037, 1045 (5th Cir.1984) (court noted that the lack of a black candidate may be the result of a racially discriminatory system); *Accord Westwego*, 872 F.2d at 1209–10 (court specifically validated the use of statistical data from the 1984 Jesse Jackson campaign, in addition to local election returns, as a "local appraisal" to establish some degree of racial bloc voting); *Citizens For a Better Gretna v. City of Gretna*, 834 F.2d 496, 502 (5th Cir.1987) ("Although exogenous elections alone could not prove racially polarized voting in Gretna aldermanic elections [the office subject to the plaintiffs' challenge], the district court properly considered them *as additional evidence of bloc voting*—particularly in light of the sparsity of available data") (emphasis added).[25] To the extent that such evidence is established and properly presented, plaintiffs may rely upon evidence drawn from elections other than those for the office in question or those limited to the local jurisdiction alone, as evidence that elections in the jurisdiction evidence racially polarized voting.[26]

---

**24.** The court does not mean to imply that it considers the track record of Councilman Basby as rebuttal evidence against a showing that blacks have not fared well in elections in Bleckley County. This would be improper as these elections did not involve the same countywide electorate involved in the commissioner elections. *Stallings* 829 F.2d at 1560 ("The district court's reliance on municipal elections in [the county] as proof of minority electoral success of a county electoral scheme is obviously misplaced"). The court does note, however, that in a case characterized by a paucity of evidence derived from local elections, the plaintiffs themselves offer a witness who has enjoyed electoral success despite white opponents in those elec-

tions, city elections requiring only a plurality for election. The court also takes note of the city council elections in which other black candidates did not fare so well, i.e., plaintiff Harris (1977), plaintiff Hall (1978), etc.

**25.** The court notes that in *Westwego*, the Louisiana district court, like the court in *Gretna*, was presented with evidence from the Jesse Jackson campaign *in addition to* evidence drawn from local elections involving black candidates in parish-wide elections. *See Westwego*, 872 F.2d at 1209.

**26.** The court does find it curious, given the *Gingles* requirement that "the minority must be

The evidence presented in the case *sub judice* with regard to the Jesse Jackson campaigns was delivered through experts and their respective contradictory opinions as to what, if anything, the available statistical analyses revealed about Bleckley County Voters. Dr. Willingham, plaintiffs' expert, himself noted that the electoral evidence in the case *sub judice* is not ideal in scope or magnitude. He stated:

> Ordinarily, one would have had as one's resource statistical information or at least voting data which could then have been subjected to statistical analysis which would have resulted in objective statistical measures of racial bloc voting. That is present in this county that only one—in only one instance and that's the instance of 1984 where there was both the black candidate running countywide and a series of precincts. And for that, racial regression analysis is possible. There is no other election that fits the—that matches those conditions and for the reason, *a key way of explaining and talking about racial bloc voting was not available to the court in this particular case.*

(Transcript, pp. 375–76) (emphasis added).[27] Not surprisingly, this is one area where defendants' expert shares the views of those put on by the plaintiffs. In pointing

out that endogenous elections are a preferable source of evidence, Dr. Wildgen stated, "[a]s one moves out from the challenged mechanism itself ... there is a scientific and an obvious logical requirement to establish some plausible connection between what happens in one office and how it might bear on what happens in a second office." (Transcript p. 678).

Despite the fact that it is called upon to analyze data and evidence drawn by plaintiffs from sources other than returns from elections for local office, as stated above, this court does not read the law in this area to allow defendants the opportunity to explain the electoral motivations underlying this broader range of evidence. Consistent with *Collins*, this court does not and will not seek to look behind the bare evidence to "ask why those votes were cast the way they were nor whether there were other factors present in contested elections, such as 'white backlash.'" *Collins v. City of Norfolk, Va.*, 816 F.2d 932, 935–936 (4th Cir.1987); *see also Stallings*, 829 F.2d at 1557–59 (defendants may not rebut plaintiffs' prima facie case of racial bloc voting with evidence of causation or intent).

Unification of the minority electorate was the hallmark of Reverend Jackson's "Rainbow Coalition" in the 1984 and 1988 Presidential Elections. Reverend Jackson's message depended upon an active, in-

able to demonstrate that the white majority votes sufficiently—in the absence of special circumstances, such as the minority candidate running unopposed, ...—*usually* to defeat the minority's preferred candidate." *Gingles*, at 48–51, 106 S.Ct. at 2765–67, 92 L.Ed.2d at 45–47 (emphasis added), that plaintiffs offer evidence drawn primarily from only two isolated elections for an office centered outside of Bleckley County, specifically evidence from the 1984 and 1988 Presidential Primaries, as evidence of racially polarized voting in Bleckley County.

27. Dr. Engstrom conducted the ecological regression analysis upon Bleckley County returns in the 1984 presidential primary. He, too, agreed that exogenous elections are not the ideal source for an expert to analyze.

Q: Do you agree that exogenous elections, such as this race (the 1984 presidential primary), are less probative of the question of vote dilution in the challenged election system?
A: Oh, I would prefer to have contests in the challenged election system involving choices between black and white candidates, yes. (Tr. 472–73). *See also Citizens for a Better Gretna v. Gretna*, 636 F.Supp. 1113, 1126 (E.D.La. 1986) *aff'd* 834 F.2d 496 (5th Cir.1987) *cert. denied* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (Dr. Engstrom, as plaintiffs' expert, conducted analysis of 1984 Jackson campaign, but also analyzed evidence from a statewide race for Secretary of State as well as two elections for the challenged office itself).

volved, cohesive minority electorate.[28] While theGcases stating that the existence of racially polarized voting establishes the cohesiveness of the minority group are legion, *see, e.g., Collins* 816 F.2d at 935, the Jesse Jackson campaigns may actually represent situations where the conscious unification of the minority community may have actually created the perception of bloc voting by the majority.[29] In essence, the progression is reversed; the mobilization of a cohesive minority electorate may work to create the perception of the existence of racially polarized voting.[30]

## The 1984 Presidential Preference Primary

Dr. Engstrom testified that the regression analysis, conducted with regard to the 1984 Jesse Jackson campaign returns in Bleckley County, related observations of two variables: the percentage of voters signing in who were black and the percentage of voters signing who voted for Reverend Jackson. Through the use of a "scattergram" or "scattered plot," Dr. Engstrom testified that he conducted a weighted regression which, according to Dr. Engstrom, demonstrated that the higher the black presence in a precinct the higher the percentage of votes cast for Jesse Jackson.[31] A homogeneous precinct analysis, or analysis of the precincts with 90% or

more white voters, also revealed that Jesse Jackson received the fewest votes of any candidate in those precincts.

Dr. Engstrom estimated Reverend Jackson's support among black voters to be 60.8%; among white voters Reverend Jackson carried just an estimated 0.9% of the votes cast. His estimates, drawn from the regression, were virtually identical to the *CBS News/New York Times* exit poll for Georgia which estimated that Reverend Jackson received 61% of black votes and 1% of the white vote statewide. The regression analysis demonstrates that white and black voters did not agree upon whom the democratic party should nominate. Jesse Jackson enjoyed the electoral support of a majority of black voters; very few white voters supported Jesse Jackson.

## The 1988 Presidential Preference Primary

Drs. Willingham and Engstrom both concluded from their research and analysis that the results of the 1988 presidential primaries revealed that voting in Bleckley County is racially polarized. Neither Defendants nor their expert agree with that conclusion.

Dr. Wildgen first levelled his criticisms at the method employed or, more appropriately, at the absence of any identifiable method used in implementing the voting poll. He suggests that Dr. Willingham's

---

**28.** The testimony of plaintiffs' expert, Dr. Willingham was as follows:
   Q: Dr. Willingham, I believe you wrote an article which was published in *Southern Politics* called *"Voter Participation is Now the Challenge,"* is that correct?
   A: Sounds like something I'd write.
   Q: You expressed in your article your opinion that the Jesse Jackson campaigns placed heavy emphasis on race in its (sic) mobilization drives, and you would agree with that today, wouldn't you?
   A: Yes, I would. (Transcript pp. 394–95).

**29.** Consider the testimony of defendants' expert, Dr. John Wildgen.
   "Q: In 1984, did Jesse Jackson do well among black voters across the country?
   A: Yes.
   Q: Did he do well in areas that, in your opinion, were not otherwise racially polarized?

A: Yes. As far as I know, on a nationwide basis, Jesse Jackson attracted an appreciable amount of the black vote ..." (Transcript pp. 683–84).

**30.** The political campaigns of the Reverend Jackson may in reality yield aberrant information if one seeks to determine sustained voting patterns in Bleckley County or in any other jurisdiction for that matter. *See Gretna,* 834 F.2d at 502.

**31.** Defendants point out that Dr. Engstrom's testimony and analysis did not include analysis of the margin for error in order to support his conclusion with regard to the estimates as to a proportional increase between black voter percentage and black voter support.

study diverged from standard practices in exit polls. Rather than attempting to distribute sample ballots to every voter, Dr. Wildgen suggests that a proper "poll" would be contrived upon notions of eliciting responses to a sample ballot that was the mirror image of the actual presidential preference ballot. Dr. Willingham's study was more akin to a census. However, by Dr. Willingham's own testimony, the ballot, unlike a census, was not distributed to all of the voters, nor did all or even a majority of the voters respond. Dr. Wildgen concluded, "so what we have here is a sort of half-breed collection of information that is not amenable to either census type analysis or to statistical analysis." (Transcript p. 691).

The actual results of the 1988 presidential preference primary were again as follows:

### REPUBLICANS

| | |
|---|---|
| George Bush | 345 |
| Bob Dole | 245 |
| Pete du Pont | 2 |
| Alexander M. Haig | 3 |
| Jack Kemp | 47 |
| Pat Robertson | 141 |

### DEMOCRATS

| | |
|---|---|
| Bruce Babbitt | 28 |
| Michael Dukakis | 210 |
| Dick Gephardt | 202 |
| Albert Gore | 933 |
| Gary Hart | 109 |
| Jesse Jackson | 250 |
| Paul Simon | 13 |
| | |
| Uncommitted Preference | 32 [32] |

A quick comparison of these results with the results projected by Dr. Willingham's poll reveals some interesting points. Using a poll that reached 993 voters, or 37.9% of the total number of voters casting ballots, Dr. Willingham sought to accurately estimate the breakdown of voter support by race. The evidence indicates that his poll failed to achieve this goal.

Were the poll truly representative of the votes actually cast there would logically be some consistency between the responses to the poll and the actual returns.[33] Yet, it is clear that the results of the poll were unrepresentatively skewed. When one compares the preferences expressed in the poll with those actually expressed in the election, it becomes evident that the poll overemphasized the electoral support received by some candidates, most importantly Reverend Jackson, and underestimated the support harnessed by other candidates.

For example, 16.2% of those voters reached by the poll supported Jesse Jackson.[34] Using this percentage figure, one would expect that around 16% of the actual votes cast would support this candidate, or approximately 420 votes. However, of the 2,620 votes cast, Reverend Jackson received only 250 votes, or 9.5% of the total votes cast.[35] Plaintiffs themselves suggest that the pollsters apparently attracted a disproportionately high number of Jesse Jackson supporters. (*See* "Plaintiffs' Response to Defendants' Proposed Findings

---

**32.** The total number of Bleckley County residents voting was 2620 out of 5,327 registered voters.

**33.** Dr. Willingham testified that there was no random sample technique used nor was there advance planning for a margin of error in the poll. (Transcript p. 401–02). Rather the naked results of the survey were intended as a reflection of the actual support distribution in the election.

**34.** This percentage figure is actually lower than Jesse Jackson's actual poll support compared to all those actually expressing a preference for one candidate or marking the uncommitted preference (the only options available on the actual ballots); compared to those numbers, the poll placed Jesse Jackson's support at 16.75%. Use of the 16.75% figure would, however, only serve to further overemphasize the support received by Jesse Jackson.

**35.** The court notes that the percentage of voter support is normally calculated with respect to other candidates within one's particular party. Here, in terms of actual voter returns, Jesse Jackson received 14.07% of Bleckley County votes cast on the Democratic party side. Dr. Willingham's poll would put 24.1% of the democratic vote behind Jesse Jackson.

of Fact and Conclusions of Law," ¶ 6, p. 7).[36]

Regardless of any possible assumptions which might be drawn from the actual 1988 presidential preference primary election returns,[37] this court is not satisfied that the results of Dr. Willingham's 1988 exit poll provide an accurate source from which the plaintiffs might buttress their position that elections in Bleckley County are characterized by white bloc voting. All the poll really *proves*, aside from the fact that it was conducted in a less than scientific manner, is that Jesse Jackson enjoyed strong support among black voters responding to the poll. Assumptions may be drawn in either direction from the flawed data in the poll. This court cannot premise its decisions upon unsupported assumptions but must demand credible evidence.[38]

Dr. Willingham stated that he was unable to engage in regression analysis with regard to the 1988 Jesse Jackson campaign. He attributed this inability to the fact that in the interim between the 1984 and 1988 elections, Bleckley County was consolidated into one precinct. This, according to Dr. Willingham, created an additional obstacle for the plaintiffs in their ability to obtain and analyze evidence. However, regardless of the obstacles encountered by plaintiffs in their analyses, the evidence presented by way of Dr. Willingham's exit poll is inconclusive and unconvincing as to whether voting in the 1988 primary was racially polarized.[39]

### Other Elections

The court notes briefly the evidence presented with regard to other elections which plaintiffs identify as elections involving racial issues or themes. These are: the 1974 Lt. Gubernatorial candidacy of J.B. Stoner, an avowed white racist who mustered an unsettling amount of support from the white electorate statewide in that year; the 1974 Gubernatorial primary, in which former Governor Lester Maddox, who had built his political career on a platform of segregation, carried Bleckley County; and the 1968 election in which, then segregationist, George Wallace received the most votes in Bleckley County.[40]

In 1974, J.B. Stoner received 426 votes or 20.4% of the total votes cast. (Plaintiffs'

---

**36.** This point becomes clear when one compares the number of voters polled who expressed a preference favoring one of the top two candidates for either party to the actual votes cast in support of those top four candidates.

| CANDIDATE | POLL SUPPORT | ACTUAL SUPPORT | % OF SUPPORTERS ANSWERING POLL |
|-----------|--------------|----------------|-------------------------------|
| Bush | 119 | 345 | (34.5%) |
| Dole | 86 | 245 | (35.0%) |
| Gore | 319 | 933 | (34.2%) |
| Jackson | 161 | 250 | (64.4%) |

**37.** Plaintiffs have misstated the evidence when they argue in reference to the 1988 poll, "[i]ts results were very close to the actual vote total received by candidate Jackson there [Bleckley County]." ("Plaintiffs' Post Trial Proposed Findings of Fact and Conclusions of Law," p. 14). Unless, of course, by this statement plaintiffs mean only that they were able to poll most every Jackson voter.

**38.** This is especially so considering the less than scientific manner in which the poll was conducted. Plaintiffs' evidence, admittedly drawn from peripheral sources, would ideally have been gathered in a manner which truly presented a local appraisal of voting in the county.

**39.** There is no contention on the part of plaintiffs that the consolidation of the multi-precinct system into one precinct was itself a violation of the Voting Rights Act; nor, do plaintiffs contend that the consolidation results in a violation of the Act.

**40.** The court notes but does not make its ruling upon the evidence presented by defendants with regard to the local results in the 1984 re-election of Georgia Court of Appeals Justice Robert Benham, a black member of the Georgia Court of Appeals. However, while the court agrees that Judge Benham, as an incumbent in a race for re-election to judicial office, was in a unique situation, one that little indicates the leanings of the county electorate with regard to local elec-

Exhibit 360). This placed him a strong second to candidate Mary Hitt. Correspondingly, Lester Maddox carried Bleckley County over eventual party nominee and Governor George Busbee; Maddox received 1007 votes or 44% of the vote. The evidence presented with regard to the 1968 presidential election amounts to one line in *The Cochran Journal. See* Plaintiffs' Exhibit 270 ("Bleckley County went almost solid for George Wallace as expected").[41]

Despite this additional evidence, which the court notes involved elections for non-local offices—occurring over 15 years ago, this case and the evidence presented with regard to alleged racially polarized voting nonetheless do not fit neatly into this stage of the *Gingles* analysis. Terms such as "racially polarized voting" and "white bloc voting" suggest a pattern or situation involving sustained recurrent bloc voting based upon race: the very evil which the Act and its amendments seek to redress. To employ a term so rich in meaning and background in reference to the evidence before this court would not be consistent with the term's true significance. Plaintiffs would have the court ignore that indeed the burden of proof lies with them to prove as a precondition to recovery that "the white majority votes sufficiently as a bloc to enable it **usually** to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766–67 (emphasis added). Despite plaintiffs efforts to weave the available data into a pattern, this evidence simply falls short of proving polarized voting. The essence of the evidence presented is summed up in the testimony of Councilman Basby. He testified:

"... you have to be known by blacks and whites to get elected for public office; therefore, you need a percentage of all black and white to get elected." (Transcript p. 312).

The Voting Rights Act does not require more than this. For this court to require more, based upon the paucity of evidence presented, would fly in the face of both the Congressional prohibition against requiring representation in proportion to the percentage of black people in the community as well as the ruling of the Supreme Court that "commentators and courts agree that in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Gingles*, 478 U.S. at 48, n. 15, 106 S.Ct. at 2765, n. 15.[42]

Any additional evidence put forward by plaintiffs with regard to socio-economic barriers to voting and participation by blacks, while relevant to the court's analysis of the vote dilution claim under the totality of the circumstances, does not bear directly upon the courts analysis of whether election results evidence racial bloc voting.[43] As the *Collins* court stated, "[t]he legal standard for the existence of racially

tions, *see Stallings*, 829 F.2d at 1558–59 (*quoting Gingles*, 106 S.Ct. at 2770) ("special circumstances, such as the absence of an opponent, incumbency, ... may explain minority success in a polarized race"), the same types of fact sensitive protestations might easily be lodged against the use of the Jesse Jackson campaigns as an indication of voter preference on the local level. The court's holding does not reflect the influence of such speculative extraneous information with regard to the Jackson campaign, but only an analysis of the evidence presented.

**41.** The court notes, but sees no relevance to defendants' evidence with regard to elections for statewide office which involved minor black candidates who received little support from either black or white voters. This evidence is simply a nullity.

**42.** While the *Gingles* Court was referring specifically to the necessary evidence "where the contested electoral structure is a multi-member district," *Id.*, the Eleventh Circuit has stated, "[w]e consider the single-member county commission to be in all essential respects comparable with the multi-member district discussed by the Court in *Gingles* ..." *Stallings*, 829 F.2d at 1549.

**43.** Such evidence falls under the Supreme Court's umbrella over evidence which is "supportive of, but *not essential* to a minority voter's claim." *Id.* (emphasis the Court's). The court must, before considering such supportive evidence, first analyze the essential evidence as to whether racial bloc voting is present. In the absence of proof of this essential element, a plaintiff's claim must fail. To find otherwise would be inconsistent with the Supreme Court's use of the term "precondition" to describe this

polarized voting looks only to the difference between how majority votes and minority votes were cast; it does not ask why those votes were cast the way they were nor whether there were other factors present in contested elections ..." *Collins*, 816 F.2d at 935. Just as defendants may not, at this stage of the analysis, object that a particular election was characterized by "white backlash," etc., plaintiffs may not rely upon socio-economic or other barriers as specific evidence that voting in the community is racially polarized. *Id.*

The court is left with very little from which to determine whether racially polarized voting is characteristic of elections in Bleckley County. Dr. Engstrom himself admitted that the results from the 1984 regression analysis and the 1988 exit poll standing alone provide little evidence from which a court could conclude that racially polarized voting exists in Bleckley County.[44] Dr. Engstrom sought to temper his admission by adding, "if that's all we had." Yet, under prevailing law with regard to this stage of the court's evaluation, the evidence to which Dr. Engstrom referred *is all* the court has or can have. *Id.*

To conclude anything other than that plaintiffs have failed to demonstrate that "the white majority votes sufficiently as a bloc to enable it *usually* to defeat the minority's preferred candidate" *Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766–67 (emphasis added), would ignore a rare point of agreement between the opposing experts in the case *sub judice:* that the electoral evidence in this case constitutes no more than a paucity. *See Stallings*, 829 F.2d at 1557 (*citing Gingles*, 106 S.Ct. at 2770) ("[T]he [*Gingles*] Court noted that racial bloc voting is more probative of a claim that a district experiences legally significant polarized voting, if a pattern of bloc voting is shown over a period of time, rather than the results of a single election"); *See also Gingles*, 478 U.S. at 48, n. 15, 106 S.Ct. at 2765–66, n. 15 ("By recognizing the primacy of the history and extent of minority electoral success and of racial bloc voting, the Court simply requires that § 2 plaintiffs prove their case"). Consistent with these views, the court finds that plaintiffs evidence fails to demonstrate a pattern of racial bloc voting.[45]

2) Cohesiveness

Despite the language from case law suggesting that to prove racially polarized voting is to prove cohesiveness, the court does not conversely read its finding of a lack of evidence of racially polarized voting to be dispositive of the issue of cohesiveness. In other words, to fail to prove polarization does not mean that the minority community suffers a lack of cohesiveness. Of course, failure to prove that Bleckley County elections are characterized by racial bloc voting effectively ends the need for further analysis of the three-pronged *Gingles* test. In the interest of completeness, the court seeks to analyze the evidence with regard to the alleged cohesiveness of Bleckley County's black community. However, as with the analysis of whether or not voting

---

stage of the analysis. *Id.* at 50, 106 S.Ct. at 2766.

**44.** Dr. Engstrom's testimony was as follows:
Q: Dr. Engstrom, from a statistical standpoint, we've looked at the '84 Jesse Jackson race and the results of the exit poll in '88 as they concern Jesse Jackson. Would you agree, based on your experience as a political scientist, that that is very little evidence in determining racial polarization in a community of a government of 77 years?
A: That by itself?
Q: Yes.
A: Would be little evidence, if that's all we had.

(Tr. 483).

**45.** The court is mindful of the Supreme Court's directive that "Where a minority group has never been able to sponsor a candidate, courts must rely on other factors that tend to prove unequal access to the electoral process." *Gingles*, 478 U.S. at 57, n. 25, 106 S.Ct. at 2769 n. 25. These other factors will indeed be considered upon the court's analysis of the remaining Senate factors; the court, however, rejects plaintiffs' arguments that evidence other than that drawn from previous elections, i.e., Bleckley County's history of racial segregation, racial themes in public forums, etc., amounts to evidence of racial bloc voting.

in Bleckley County is demonstrably polarized, the court is shackled by the paucity of evidence presented.[46]

While Dr. Engstrom offered testimony as to his preconceived notion that, in general, where blacks clearly have an opportunity to elect a candidate of their choice, blacks offer and are elected for those seats, there is little evidence in the record to verify that Bleckley County specifically has a cohesive black electorate.[47] Specific evidence of cohesiveness must be presented.

To hold that the expert testimony of Dr. Engstrom alone meets the requirement that plaintiffs demonstrate the cohesiveness of Bleckley County's black community would amount to an abdication of the requirement set out by the *Gingles* Court altogether; cohesiveness would be presumed. Plaintiffs' less than convincing argument suggests that all any plaintiff need prove to meet the cohesiveness precondition would be the very existence of a black community. While the evidence presented at trial exceeds that referenced in plaintiffs' proposed findings of fact, the record nonetheless fails to demonstrate that the black community in Bleckley County has "common interests evidenced by a *pattern* of bloc voting." *See Solomon*, 899 F.2d at 1019 (*citing Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766–67) (emphasis added).

Dr. Engstrom's regression analysis of the 1984 primary provides strong evidence that Bleckley County's black electorate supported Jesse Jackson; the same conclusion might have been drawn from a well-implemented poll of the voters in 1988. But the results of two presidential preference primaries alone cannot be said to evidence a pattern. Plaintiffs also make reference to the electoral successes of black candidates in the majority black voting districts for the Bleckley County Board of Education as additional evidence of the cohesiveness of Bleckley County's black community. Specifically, plaintiffs point to the elections of plaintiff Reverend Hall to the school board in the 1986 election and the re-elections of Councilman Basby after the at-large electoral system was abandoned in favor of separate city council districts. Both of these men, black members of the community, represent majority black districts.

This court is not satisfied that plaintiffs have proven that the black community in Bleckley County is a politically cohesive one. This stage of the *Gingles* test is analogous to that in which the court analyzed the presence or absence of racial bloc voting evidence. Like that stage of the analysis of the present facts, the court is faced here with little credible evidence which would lend itself to a valid determination. Here, as there, counsel have presented conclusory materials without evidence sufficient to show the requisite pattern under *Gingles*.

The present case, so factually distinct from cases which have determined that a cohesive minority electorate merited remedy under the *Gingles* test, is void of credible evidence to demonstrate either a strong pattern of correlation between the number of registered black voters and the number of votes received by a candidate expected to receive black support or a pattern of unified support for particular candidates from the black community. This is what *Gingles* requires, and this court may require no less at this stage of its analysis.

---

**46.** The court does not rely upon evidence which defendants sought to introduce regarding minor black candidates for state-wide office; the weak performances of these candidates are less a demonstration of a lack of minority cohesiveness than they are a commentary upon the political vitality of those particular candidates.

**47.** Plaintiffs' proposed findings of fact overstate the specificity of the testimony of Dr. Engstrom in this regard. Plaintiffs' expert was speaking in general terms and referred to the cohesiveness of the black community in Bleckley County only insofar as a perception of cohesiveness which Dr. Engstrom, without the benefit of having ever been to Bleckley County, assigned to the local white electorate. ("Plaintiffs' Post–Trial Proposed Findings of Fact and Conclusions of Law," p. 24, ¶ 55; Transcript pp. 425, 435, 438).

Plaintiff's evidence simply fails to prove that Bleckley County's black community is politically cohesive.

### 3) Compactness

There can be but little dispute that the black community is sufficiently geographically compact to meet the *Gingles* standard. To their credit, counsel apparently refrained from their respective propensities and left this area unencumbered by surplusage. Defendants themselves relied in part upon evidence drawn from the majority black school board voting district to put forward evidence refuting plaintiffs' arguments with regard to cohesiveness. Although Bleckley County's entire black community is not concentrated in a single area, the evidence drawn from the 1988 voter registration data offered by defendants demonstrates that voting district # 2 is approximately 55% black; blacks in the other four districts make up approximately 10% or less of the population in that district. Were the evidence to demonstrate that the commission should be enlarged, there is certainly a concentration of black voters in at least one demographic area. (Defendants' Exhibit 13).

### 4) Results of the *Gingles* Test

Despite a full presentation by the parties, an evaluation of all the available evidence can lead to only one conclusion. Plaintiffs' evidence fails to meet two requisite preconditions to relief as set out by *Gingles*. There is insufficient available evidence from which the court might determine that either racial bloc voting or a cohesive black electorate are proven characteristics of Bleckley County.[48] Considering only those factors set out by the *Gingles* Court, plaintiffs have failed to prove that the current single commissioner form of government in Bleckley County results in less opportunity for members of the black community to participate in the political process or to elect representatives of

their choice. *See Gingles*, 478 U.S. at 48, n. 15, 106 S.Ct. at 2765, n. 15 ("Consequently, if difficulty in electing and white bloc voting are not proved, minority voters have not established that the ... [challenged] structure interferes with their ability to elect their preferred candidates").

### B. Other Senate Factors

Once the *Gingles* test is satisfied, it is unclear whether a court is to analyze factors beyond those set out by the *Gingles* Court. This court, however, is not faced with such a situation. The significance of any additional evidence relevant to other Senate factors is limited by the court's determination that plaintiffs have failed to present evidence sufficient to satisfy the *Gingles* test. *See Gingles*, 478 U.S. at 49, 106 S.Ct. at 2766 ("These circumstances [the *Gingles* test] are *necessary preconditions* for multimember districts to operate to impair minority voters ability to elect representatives of their choice ...") (emphasis added). As stated above, the Eleventh Circuit has determined that the single member commission is in all relevant respects comparable with the multi-member districts. *Stallings*, 829 F.2d at 1549; n. 42, *supra.*

It would appear, then, that this court is not called upon to analyze the remaining Senate factors in order to render an opinion in the case *sub judice.* Were it not for a singular cryptic directive from the Supreme Court, this court's already exhaustive analysis would be at its end. However, in *Gingles*, the Court noted:

> Where a minority group has never been able to sponsor a candidate, courts must rely on other factors that tend to prove unequal access to the electoral process.

*Gingles*, 478 U.S. at 57, n. 25, 106 S.Ct. at 2769–70, n. 25. In *Gingles*, a case which like most cases addressing themselves to alleged violations of § 2 of the Act, in-

---

**48.** The court does not suggest a failure to present otherwise available evidence leaves plaintiffs' case incomplete. As evidenced by the expansive, and no doubt expensive, efforts of the respective experts and attorneys, the evidence supporting the requisite *Gingles* preconditions is simply unavailable.

volved evidence drawn from several elections, the Court appears to have attempted to anticipate a claim such as the unusual one before this court today. *See Westwego Citizens for Better Government v. Westwego*, 906 F.2d 1042, 1045 (5th Cir.1990) ("*Gingles*" teaches that where only a few (or no) indigenous elections include black sponsored candidates, a vote dilution claim is not foreclosed").

Sensitive to Supreme Court directives and consistent with cases addressing situations where local election returns suffer limited availability, this court has considered credible evidence put forward by plaintiffs with regard to allegations that racial bloc voting contaminates the challenged electoral structure in Bleckley County. It appears, according to the cases which have addressed the footnote in *Gingles*, that the language used by the Supreme Court, while ambiguous, was intended to prevent trial courts from refusing to consider credible evidence drawn from any election with regard to racially polarized voting. However, read in another light, the footnote arguably directs a trial court to return to the Senate factors and the flexible test which have been otherwise abandoned. Even were this court to accept this reading of the Supreme Court directive, a reading which the court notes was not specifically proposed by plaintiffs, the evidence, nevertheless, fails to demonstrate that a change in the current structure of the county commission constitutes an available or proper remedy under the Act.

The facts in this case clearly indicate that Bleckley County's black community yet suffers the indignities associated with a proportionally poorer socio-economic status. Plaintiffs' expert, Dr. Willingham, provided extensive testimony that blacks in Bleckley County continue to suffer from a depressed socio-economic status, and that their socio-economic status hinders the possibility of blacks participating actively in the political process. He added that traditional barriers still work to make it un-

usually difficult for a candidate, black or white, who is depending upon black voters to sustain the interest of black community voters. There was testimony that unemployment and illiteracy are considerably higher within the black community than amongst whites. There appear also to have been problems in the past with regard to low black representation among workers at the election polling place.

Yet, with regard to the remaining Senate factors, it appears that little can be said to disparage Bleckley County. It is undisputed that there is no slating process to stand as a barrier to minority participation. Finally, as to whether the commission in Bleckley County fails to respond to the needs of the community or whether the county, as evidenced in the 1986 referendum, seeks to retain the single member commission to effectuate a tenuous policy, much has been said, but little has been proven. As stated above, there appears to be widespread local disagreement over the respective merits and short-comings of the alternative systems given the size and revenue base of Bleckley County. After considering all the relevant evidence, it appears that what remains before the court is simply a whole community's disagreement over their preferred form of local government. This court does not have the authority to resolve such purely political disputes. The court's powers extend only to the resolution of disputes involving a violation of the Constitution, the Voting Rights Act or some other law.

The court's brief analysis of these additional factors provides some indication as to why the three principal factors covered by the *Gingles* test enjoy preferred evidentiary status in vote dilution claims. While plaintiffs' inability to present sufficient credible evidence drawn from local elections does not foreclose a vote dilution claim, the inability to present credible evidence supportive of the factors to be considered under the Act does foreclose a successful one in the case *sub judice*. Under any standard, under any reasonable test,

considering every piece of credible relevant evidence and all factors, plaintiffs' challenges to Bleckley County's single member commission must fail.

## CONCLUSION

Plaintiffs have failed to meet either the minimum preconditions under the *Gingles* test or to present sufficient evidence in light of the other Senate factors under the totality of the circumstances. The evidence presented at trial with regard to these factors, while characteristically protracted, was neither compelling nor persuasive.

While a naked analysis of the Bleckley County voter registration rolls leaves exposed the possibility that a white candidate harnessing all of the white voter support in Bleckley County could conceivably use that unified support to trample the equally imaginary candidate (black or white) supported by the whole of the black electorate, the evidence presented at trial, by both defendants *and* plaintiffs, when interwoven with the relevant case law and considered under the totality of the circumstances, does not clothe this court with the power to strike down an electoral practice or procedure which *might* lead to such an abhorrent potential result. To require the change sought by plaintiffs, based upon the paucity of evidence before this court, would serve the purpose specifically proscribed by Congress of ensuring that members of the black community would be elected in numbers equal to their proportion in the population.

Plaintiffs cannot prevail on their claims that Bleckley County's sole commissioner form of government violates either the Constitution or Section 2 of the Voting Rights Act. Accordingly, let judgment be entered for the defendants.

SO ORDERED.