Rev. E.K. HALL, Sr.; David Walker; U.S. Donalson; Richard Harris; Willie Ates; Rev. Wilson C. Roberson; and NAACP Chapter of Cochran, Bleckley County, Plaintiffs–Appellants,

v.

Jackie HOLDER, Individually and in his official capacity as County Commissioner for Bleckley County, Georgia; Robert Johnson, Individually and in his official capacity as Superintendent of Elections for Bleckley County; Charles Killebrew, Individually and in his official capacity as Mayor of the City of Cochran; Lonnie Barlow; Ben Jessup; C.C. Crooms; Willie Basby; Billy Ray Godfrey, and T.C. Greer, Individually and in their official capacities as Aldermen of the City of Cochran; William J. Lucas, Individually and in his official capacity as Superintendent of Elections for the City of Cochran; Freddie White; Wayne Rogers; Wayne Tripp; Sonja Curtis, and J. Larry Williams, Individually and in their official capacities as Members of the Bleckley County Board of Education, Defendants–Appellees.

No. 91–8306.

United States Court of Appeals,
Eleventh Circuit.

March 25, 1992.

Christopher Coates, Milledgeville, Ga., Laughlin McDonald, ACLU, Atlanta, Ga., for plaintiffs-appellants.

R. Napier Murphy, Martin Snow, Grant & Napier, John C. Daniel, Ill., Macon, Ga.,

William Lonnie Barlow, Arnold & Barlow, Cochran, Ga., for defendants-appellees.

Before FAY and HATCHETT, Circuit Judges, and GIBSON *, Senior Circuit Judge.

FAY, Circuit Judge:

This appeal involves a challenge to the sole commissioner form of county government utilized in Bleckley County, Georgia. Following a four day bench trial, the district court found that the plaintiffs had failed to meet their burden of proof on both their statutory and constitutional claims. For the reasons that follow, we REVERSE the judgment of the district court.

## I. BACKGROUND

### A. *Bleckley County*

The history of Bleckley County began in 1912 when the Georgia legislature created Bleckley County from land located at the northeastern end of Pulaski County, Georgia. Encompassing about 219 square miles, Bleckley County is a rural county located in the central region of Georgia, approximately forty miles southeast of Macon.

Throughout its existence, Bleckley County has had a population that has ranged from about 9,000 residents to nearly 11,000 residents. According to census figures, the population of Bleckley County numbered 10,767 in 1980.[1] That population is approximately 22% black, 77% white, and 1% other.[2] The racial composition of Bleckley County's voting age population is 19% black, 80% white, and 1% other. Voter

---

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. The population figures used at trial come from the 1980 census. Since the trial, however, the data from the 1990 census has become available. The new census reveals that Bleckley County's population has decreased to 10,430. The population decrease of blacks has been proportionately smaller than the decrease of whites, thereby causing Bleckley County to have a slightly increased percentage of blacks.

2. Nearly half of Bleckley County's population lives in the city of Cochran, the county seat. In Cochran, the percentage of black residents is considerably higher than in the county as a whole. There, the racial composition of the population is approximately 33% black, 64% white, and 3% other.

registration levels in Bleckley County are roughly equivalent among blacks and whites, with black and white registration each at about 70% of each group's respective eligible population.

Since its creation, Bleckley County has operated with a sole commissioner form of county government. See 1912 Ga.Laws 38; 1913 Ga.Laws 345. This sole commissioner is the "county governing authority" under Georgia law, O.C.G.A. § 1–3–3(7), and he is vested with all the corresponding powers and duties, see id. § 36–5–22.1.

Bleckley County's sole commissioner is elected in an at-large county-wide election. Although the commissioner race has at times been subjected to a majority vote requirement, throughout most of its history, Bleckley County has elected its sole commissioner by a simple plurality vote. Since 1964, however, the county must elect its commissioner by a majority vote. See O.C.G.A. § 21–2–501.

Today, the election for county commissioner is held at the Jaycee Barn in Cochran. This facility, a building belonging to an all-white civic club, is the sole polling place for the entire 219 square mile area that makes up Bleckley County.[3] This sole precinct is also used for the elections of other county officials, including the members of the county's school board.[4]

### B. Procedural History

On July 17, 1985, the plaintiffs-appellants in this case, black voters residing in Bleckley County, Georgia, together with the NAACP Chapter of Cochran/Bleckley County, filed a complaint in the United States District Court for the Middle District of Georgia. Among the claims asserted, the plaintiffs presented a challenge to Bleckley County's form of county government under § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, and under the Fourteenth and Fifteenth Amendments.[5] The defendants named in this challenge, the appellees herein, are Bleckley County's sole county commissioner and the county's superintendent of elections.

In December of 1989, over four years after this action was commenced, the district court tried this case without a jury. On March 7, 1991, more than a year after that trial, the district court entered an extensive order finding that the plaintiffs had failed to establish either a racially discriminatory intent in the creation or maintenance of Bleckley County's form of government or an impermissible dilution of the electoral power of Bleckley County's black minority. The district court entered a final judgment for the defendants, and the plaintiffs filed a timely appeal.

## II.  DISCUSSION

In reviewing the judgment of the district court, we are bound by the clearly erroneous test set forth in Rule 52(a) of the Federal Rules of Civil Procedure, the standard upon which an appellate court is to review ultimate factual findings of vote dilution. Thornburg v. Gingles, 478 U.S. 30, 78–79, 106 S.Ct. 2752, 2781, 92 L.Ed.2d 25 (1986); Carrollton Branch of NAACP v. Stallings, 829 F.2d 1547, 1554 (11th Cir. 1987), cert. denied, 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988). Nonetheless, this standard does not bar a court from correcting errors of law or findings of fact based on misconceptions of the law. Gingles, 478 U.S. at 79, 106 S.Ct. at 2781; Concerned Citizens v. Hardee County Bd. of Comm'rs, 906 F.2d 524, 526 (11th Cir. 1990); Stallings, 829 F.2d at 1554.

---

3. A number of polling places were previously available throughout Bleckley County, providing ready access to voters in the outlying areas of the county. These precincts were consolidated shortly after the 1984 presidential primaries.

4. Despite the existence of only one precinct, school board members are not elected in an at-large election. Instead, the multi-member board is elected from five single-member districts. This is accomplished in the sole precinct setting by assigning the voters from each district to specified voting machines that correspond to their districts.

5. In their complaint, the plaintiffs also challenged the manner of electing the Bleckley County Board of Education and the Cochran City Council. Those claims were settled prior to the trial of this case, however, and the challenge to Bleckley County's form of government was the sole claim tried in the district court.

### A. The Voting Rights Act

■ The statutory claim we address on appeal is unusual in that it challenges a local form of government composed solely of one commissioner.[6] It is not a unique challenge, however, and we have already held that § 2 challenges to sole commissioner forms of government are subject to the same analysis employed by the United States Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). *Stallings*, 829 F.2d at 1549.

■ The essential dictate of § 2 of the Voting Rights Act, as amended, is:

No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....

42 U.S.C. § 1973(a). At one time, § 2 was interpreted to require proof of discrimina-

tory intent in the design or maintenance of a challenged scheme before plaintiffs could prevail on their statutory claims. *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (plurality opinion). In 1982, however, Congress amended § 2 so as to make clear that the "results test" utilized by pre-*Bolden* courts is the proper standard by which § 2 claims are to be measured. *See Chisom v. Roemer*, —— U.S. ——, 111 S.Ct. 2354, 2363 & n. 21, 115 L.Ed.2d 348 (1991); *Gingles*, 478 U.S. at 43–44 & n. 8, 106 S.Ct. at 2762 & n. 8; *Solomon v. Liberty County*, 899 F.2d 1012, 1015 (11th Cir.1990) (en banc) (Kravitch, J., specially concurring), *cert. denied*, —— U.S. ——, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991); *id.* at 1027–32 (Tjoflat, C.J., specially concurring). In amending § 2, Congress also made clear that courts are to evaluate § 2 claims in light of "the totality of circumstances" upon which such claims are premised. 42 U.S.C. § 1973(b). Accordingly, courts are to consider a wide variety of factors when confronted with § 2 challenges.[7]

**6.** Although the plaintiffs asserted both statutory and constitutional vote dilution claims, because we hold that this case establishes a violation of § 2 of the Voting Rights Act, we do not reach the plaintiffs' claim of a constitutional violation. *See Escambia County v. McMillan*, 466 U.S. 48, 51, 104 S.Ct. 1577, 1578, 80 L.Ed.2d 36 (1984) (a violation of § 2 moots a constitutional claim of vote dilution).

**7.** The factors most frequently set forth for consideration are the "typical factors" listed in the Senate Report accompanying the 1982 amendments to § 2. These factors, now known as "the Senate Report factors," are listed below:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether the political campaigns have been characterized by overt or subtle racial appeals;
7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

S.Rep. No. 97–417, 97th Cong., 2d Sess. 28–29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206–07 (footnotes omitted). The Senate Report also noted that additional factors had been shown to have probative value in establishing a violation:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 29, *reprinted in* 1982 U.S.C.C.A.N. at 207 (footnotes omitted). Despite the Senate's express enumeration of these typical factors, "this list of factors is neither comprehensive nor exclusive." *Thornburg v. Gingles*, 478 U.S. 30, 45, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1980). Other factors may be considered, and a "functional" view of the political process will determine the

Although various factors may be relevant to a § 2 claim, before a challenged procedure will violate § 2, "a bloc voting majority must *usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group." *Gingles*, 478 U.S. at 49, 106 S.Ct. at 2766. Accordingly, there are three "necessary preconditions" to the establishment of a § 2 violation: (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) "the minority group must be able to show that it is politically cohesive"; and (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Id.* at 50–51, 106 S.Ct. at 2766 (citations omitted).

Although the *Gingles* Court set forth these three factors as preconditions to a § 2 claim, we are mindful that "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* at 47, 106 S.Ct. at 2764. A limitation on the evidence to be considered in evaluating the *Gingles* factors is neither what Congress intended in § 2 nor what the Supreme Court directed in *Gingles*. Rather, the *Gingles* decision places a "gloss" on the Senate Report factors, limiting the use of the factors by requiring that the three *Gingles* factors be established to prove a vote dilution claim. *Stallings*, 829 F.2d at 1555 (citing *Collins v. City of Norfolk*, 816 F.2d 932 (4th Cir.1987)). The *Gingles* majority did not, however, limit the manner in which the threshold factors may be proven. In fact, the legislative history of § 2 reveals that Congress espoused a "flexible, fact-intensive test for § 2 violations." *Gingles*, 478 U.S. at 46, 106 S.Ct. at 2764. Thus, the totality of the circumstances surrounding a § 2 claim may properly be considered when determining whether plaintiffs have established the three *Gingles* preconditions.[8] *See Solomon,* 899 F.2d at 1017 (Kravitch, J., specially concurring). Although § 2's functional view of the political process elevates certain Senate Report factors because of their direct bearing on the § 2 threshold inquiry, other relevant factors remain "supportive of, but *not essential to,* a minority voter's claim." *Gingles*, 478 U.S. at 48–49 & n. 15, 106 S.Ct. at 2765 & n. 15. These factors become relevant at the *Gingles* threshold stage insofar as they are supportive of the three *Gingles* factors. The additional factors, however, need not be present to satisfy the *Gingles* test.[9]

## B. *Gingles Analysis*

On appeal, the plaintiffs-appellants argue that: (1) the district court erred as a matter of law by limiting its consideration to only

---

interplay and weight of the various relevant factors. *See id.*

8. If the totality of the circumstances could not be considered in reviewing the *Gingles* factors, then courts would often be left to consider statistical and census data in an inappropriate contextual vacuum. The interaction of social and historical conditions with the challenged system would not be considered despite the fact that such interactions are central to § 2 claims. Moreover, plaintiffs would always be forced to present mathematically "certain" statistical data in order to sustain their evidentiary burdens under the preponderance of the evidence standard. Even where the totality of the circumstances established that a challenged system violated § 2, plaintiffs would be unable to prevail if the method of polling or the electorate's size and composition were such that the gathering of

mathematically "certain" statistical data would be impossible. *Gingles* does not require such a result. *Cf.* 478 U.S. at 57 n. 25, 106 S.Ct. at 2769–70 n. 25.

9. Although the *Gingles* factors may have been established in a particular case, the continuing role of the parties and of the court is unclear: This circuit remains divided on the issues of whether plaintiffs can make out a § 2 violation simply by establishing the *Gingles* factors and whether defendants can raise a defense under the totality of the circumstances after the plaintiffs have satisfied the *Gingles* preconditions. *Solomon v. Liberty County*, 899 F.2d 1012, 1013 (11th Cir.1990) (en banc) (per curiam); *id.* at 1017, 1021 (Kravitch, J., specially concurring); *id.* at 1033 (Tjoflat, C.J., specially concurring).

certain types of evidence of a § 2 violation; and (2) the district court erred in finding that the plaintiffs had failed to meet their burden of proof. In reviewing the district court's determinations on the threshold *Gingles* factors, we agree with the district court that Bleckley County's black electorate is sufficiently large and geographically compact to meet the first prong of the *Gingles* test. However, we disagree that the evidence failed to establish the other two *Gingles* factors, a politically cohesive minority and a white majority bloc that votes so as to usually defeat the black minority's preferred candidates. Additionally, we hold that Bleckley County's sole commissioner system violates § 2.

### (1) Size and Geographic Compactness of Minority Group

■ The evidence presented at trial reveals that black voters comprise a majority of the electorate in one of the five districts currently found in Bleckley County.[10] The defendants argue, however, that using these districts as a measure of the size and geographic compactness of Bleckley County's electorate is inappropriate. Instead, the defendants contend that the proper measure of size and geographic compactness should be the entire county. Because the county currently elects only one commissioner, the defendants argue that a black electorate constituting only 22% of the county's population can never form a majority with the potential to elect Bleckley County's sole commissioner. They argue that it is improper to subdivide this "commissioner district" when performing a § 2 analysis.

■ Although § 2 clearly states that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population," 42 U.S.C. § 1973(b), it is appropriate to consider the size and geographical compactness of the minority group within a restructured form of the

challenged system when the *existing structure* is being challenged as dilutive. In *Gingles,* the Supreme Court recognized that threshold significance is given to this first *Gingles* factor because: "Unless minority voters possess the *potential* to elect representatives *in the absence of the challenged structure or practice,* they cannot claim to have been injured by that structure or practice." 478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17 (second emphasis added). Thus, before a voting rights injury can be established, the minority group must demonstrate its potential electoral power in the absence of the challenged structure. It is therefore highly relevant to the *Gingles* inquiry "whether black voters ... are sufficiently numerous and compact to constitute a majority in a single member district, *if single member districts were created out of the one county district."* *Stallings,* 829 F.2d at 1563 (emphasis added). For that reason, this court remanded a challenge to the sole commissioner structure in Carroll County, Georgia to the district court with instructions to consider size and geographic compactness within proposed three member and five member forms of commission government. *Id.*

Because the evidence in this case reveals that Bleckley County's black voters are sufficiently numerous and geographically compact to constitute a majority in a single-member district (e.g., District 2), we agree with the district court that the first *Gingles* factor has been satisfied.

### (2) Existence of Racial Bloc Voting

In analyzing the issue of racial bloc voting, the district court focussed on raw election figures and statistical calculations. In particular, the district court concentrated on regression analysis statistics from the 1984 presidential primary and on exit poll data from the 1988 presidential primary, evidence taken from presidential primaries involving the Reverend Jesse Jackson. The court also looked to the successes of local black politician Willie Basby in Coch-

---

10. The five currently existing districts were formed for purposes of electing the county's multi-member school board. Within one of these districts (District 2), black voters consti-

tute approximately 65% of the electorate; within the other districts, they constitute no more than 12% of the electorate. (Defs. Ex. 13).

ran City Council elections and discussed the support garnered by black candidates in a number of races. The district court then limited its consideration to only that evidence which it believed § 2 jurisprudence would allow it to consider. It concluded from that evidence that there was a paucity of electoral evidence showing racially polarized voting, *Hall v. Holder*, 757 F.Supp. 1560, 1580 (M.D.Ga.1991), and that the plaintiffs had failed to carry their burden of proof on the racial bloc voting *Gingles* factor.

■ However, the district court reached this conclusion while operating under a misconception of the law. The district court stated that "under prevailing law with regard to this stage of the court's evaluation, the evidence [from the 1984 and 1988 presidential primaries] *is all* the court has or can have." *Hall*, 757 F.Supp. at 1580 (citing *Collins*, 816 F.2d at 935). The court reasoned that non-electoral evidence "does not bear directly upon the courts [sic] analysis of whether election results evidence racial bloc voting." *Id.* at 1579 (footnote omitted). Although the district court's legal interpretation of the evidence would support the district court's ultimate conclusion, such restricted, piecemeal consideration of the evidence failed to take into account the synergistic effects of evidence in establishing racially polarized voting.

■ Here, non-electoral evidence was not being offered to rebut electoral evidence showing the existence of racially polarized voting; instead, it was offered to buttress such evidence. Moreover, the use of non-expert testimony and non-statistical evidence has been approved by this court as a means of proving racially polarized

voting. *See, e.g., Stallings*, 829 F.2d at 1558 (noting that it is "clearly acceptable" to use non-expert testimony in establishing racially polarized voting); *United States v. Marengo County Comm'n*, 731 F.2d 1546, 1567 n. 34 (11th Cir.) (quoting *Nevett v. Sides*, 571 F.2d 209, 223 n. 18 (5th Cir. 1978), *cert. denied*, 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980)), *cert. denied and appeal dismissed*, 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984); *see also Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1118 (5th Cir. 1991). *But see Collins*, 816 F.2d at 935–36 (rejecting the use of causation evidence concerning voting patterns). In situations where election data and derivative statistical information are systemically unavailable, such as when plaintiff minority groups are unable to sponsor candidates, the Supreme Court has further directed courts to rely on factors beyond election data that tend to prove unequal access to the electoral process. *See Gingles*, 478 U.S. at 57 n. 25, 106 S.Ct. at 2770.[11] Examining the issue of racial bloc voting under the totality of the circumstances existing in Bleckley County, we are forced to conclude that the district court reached a clearly erroneous conclusion based on its misconception of the law.

In this case, the district court was not confronted with a complete lack of relevant election and statistical information. Indeed, Bleckley County election results for races in which blacks ran for state and national offices were submitted into evidence. Similarly, election results were submitted for races in which blacks ran for office in the city of Cochran.[12] Yet, blacks have neither sponsored candidates nor run for county-wide positions in Bleckley Coun-

11. Although the district court correctly interpreted this language in *Gingles* as expanding the scope of permissible evidence of racial bloc voting, it construed the expansion to include nothing but data from exogenous elections, *i.e.*, elections for offices existing apart from the challenged local structure. We find that construction of *Gingles* to be too narrow.

12. Despite the submission of these election results, statistical correlations between the race of voters and the way in which ballots were cast could not generally be calculated in Bleckley

County. This absence of statistical data resulted directly from the manner in which Bleckley County runs its elections and the manner in which Bleckley County records the results of those elections. The district court specifically stated that it was not suggesting that the plaintiffs had failed to present all available statistical evidence; the court simply believed that the instant case involved a paucity of *statistical* evidence. *Hall v. Holder*, 757 F.Supp. 1560, 1573 n. 22 (M.D.Ga.1991).

ty's government. Specifically, Bleckley County's blacks have not sponsored a candidate for the sole commissioner seat, and no black has ever run for the office of commissioner.[13] Lay testimony by Bleckley County's black community leaders, many of whom are seasoned local politicians, revealed a belief that it is next to impossible for a black candidate to win an at-large county-wide election in Bleckley County, primarily because of the impact of the non-Cochran vote, a vote having a substantially lower percentage of blacks. The individual and collective experiences of these black leaders reveal that, as a practical political matter, blacks are unable to sponsor candidates for Bleckley County's sole commissioner office because such candidacies are futile. The district court itself recognized this futility at trial, commenting as follows: "Having run for public office myself, I'll guarantee you, under the circumstances, I wouldn't run if I were black in [Bleckley] county. You're going to put your hard-earned time and shoe leather campaigning throughout this county ... under these circumstances?" (R6:808). Notwithstanding this assertion, the district court relied only on electoral evidence and chose not to consider the impact of the totality of the circumstances on the issue of racial bloc voting.

The district court did, however, recognize the following: "The regression analysis [of the 1984 presidential primary] demonstrates that white and black voters did not agree upon whom the democratic party should nominate. Jesse Jackson enjoyed the electoral support of a majority of black voters; very few white voters supported Jesse Jackson." *Hall*, 757 F.Supp. at 1576. That conclusion resulted from regression analysis data revealing that 60.8% of black voters supported Jackson while only 0.9% of white voters supported Jackson.[14] Exit poll data also indicated that black support for Jackson increased to over 90% of the black electorate in the 1988 presidential primary while white support was at a level of less than 2% of the white electorate.[15] Yet, the district court concluded that this evidence failed to establish a pattern of racially polarized voting or racial bloc voting. The district court reasoned that there was no specific, direct evidence of racial polarization or racial bloc voting *in local county elections*. The record and the district court's factual findings nonetheless reveal that there was racially polarized voting in Bleckley County.

Election results in the city of Cochran reveal that black candidates were regularly

---

13. Only one black candidate, the Reverend E.K. Hall, has run for a county-wide position in Bleckley County. He lost a race against a white candidate in 1984, only to be elected in 1986 as the county school board representative of District 2, Bleckley County's majority black district.

14. The district court pointed out that the plaintiffs' regression analysis did not include an indication of a "margin of error." Yet, the regression figures were nearly identical to figures compiled in a *CBS News/New York Times* exit poll for the state of Georgia. Moreover, the record reveals that correlation coefficients for the regression analysis were over 0.9 for the "r" values and over 0.8 for the "r²" values, both in the weighted and in the unweighted regression analyses. The range for such coefficients ranges from 0 to 1, with 0 indicating no relationship and 1 indicating a perfectly consistent relationship. *See Solomon*, 899 F.2d at 1020 n. 9 (Kravitch, J., specially concurring).

15. The district court erred in concluding that the exit poll data had no evidentiary value whatsoever simply because the court concluded that

the poll required the drawing of "assumptions" from the actual election returns. The court's error was the result of its erroneous legal conclusion that the poll results must themselves *prove* racially polarized voting in the analyzed election. *See Hall*, 757 F.Supp. at 1578 ("All the poll really *proves,* aside from the fact that it was conducted in a less than scientific manner, is that Jesse Jackson enjoyed strong support among black voters responding to the poll."). Although the court found that assumptions could be drawn in "either direction from the flawed data in the poll," *id.,* the court did not consider the light that the totality of the circumstances surrounding that election would have shed on the poll results. Such evidence would have strengthened the credibility and reliability of the poll as an indicator of racial bloc voting. At the same time, the increased evidentiary value of the poll results would have served to increase the evidentiary value of the other evidence in establishing a pattern of racial bloc voting. In the context of establishing a pattern of racially polarized voting, the interplay of evidence with its synergistic effects should not be ignored.

defeated by white candidates in at-large elections conducted in the city.[16] However, after city elections were restructured so that the city of Cochran had a majority black district, black candidates were elected as the representatives of the majority black district. Similarly, although the only black candidate who had run in an at-large county-wide election had been soundly defeated, that same candidate was elected by the newly created majority black school board district in the first election where the majority black district was permitted to elect a county official.

Evidence was also presented of elections involving racial themes: the 1974 Lt. Gubernatorial race involving J.B. Stoner, an avowed white racist; the 1966 and 1974 Gubernatorial races involving Lester Maddox, a former governor who had built his political career on segregation; and the 1968 presidential race involving then-segregationist George Wallace. Although these elections occurred over fifteen years prior to the trial of this case, the significant support garnered by these candidates indicates that a substantial number of Bleckley County's voters were highly susceptible to racist, segregationist appeals as late as the mid 1970's, and that they voted accordingly.

A number of the district court's other specific factual findings, coupled with election evidence, reveal that Bleckley County indeed suffers from racially polarized voting. For instance, Bleckley County had enforced racial segregation in all aspects of local government and local government services until forced to change by federal legislation in the 1960's. *Id.* at 1562. Bleckley County had debated and fought desegregation in all aspects of public life, continuing its resistance until as late as the early 1970's. *See id.* Local government had deprived blacks of the opportunity to participate in public life and government, even prohibiting blacks from registering to vote and from voting until well into the 1960's. Although Bleckley County's government discontinued these overt racial practices, largely due to federal intervention, the black citizens of Bleckley County continue to suffer from the effects of discrimination—socio-economic conditions that are far more depressed than those of their white counterparts.[17] *Id.* at 1562–63. This depressed socio-economic situation "hinders the ability of and deters black residents of Bleckley County from running for public office, voting and otherwise participating in the political process," *id.* at 1563, with the sole precinct system in Bleckley County

**16.** The only local black politician who has enjoyed any appreciable success in at-large elections in Cochran is Willie Basby. *See Hall,* 757 F.Supp. at 1568 (setting forth the election results in Basby's races for the Cochran City Council). Although the district court generally excluded Cochran election results from its consideration because they did not involve the full Bleckley County electorate, *id.* at 1574 n. 24, the court stressed the "electoral anthology of the triumphs" of Councilman Basby as the most pronounced evidence offered by the plaintiffs. *Id.* at 1573. Yet, the district court recognized at trial that Basby's successes were an aberration, due largely to circumstances that were particular to Basby and which had allowed Basby to garner unusually high cross-over support from Cochran's white voters. (R6:808, 811). Moreover, Basby's initial success occurred only during an election requiring a simple plurality, his first two victories were attained by narrow margins, and he has been running unopposed since his third victory (attained in his fifth campaign).

Still, the district court did not properly discount Basby's successes despite Basby's aberrational status and despite Basby's own assertions

that he could not achieve the same success on a county-wide basis. Instead, the court considered his campaigns, although not "as rebuttal evidence against a showing that blacks have not fared well in elections in Bleckley County." *Id.* at 1574 n. 24. The many and much more common defeats of other black candidates were relegated to the following level of consideration: "The court also takes note of the city council elections in which other black candidates did not fare so well, i.e., plaintiff Harris (1977), plaintiff Hall (1978), etc." *Id.* Notably, there were 12 at-large elections in which blacks ran losing campaigns in Cochran against white candidates. Basby, on the other hand, was elected over white candidates on 3 occasions: once with 39% of the vote, once with 50.5% of the vote, and once with 70% of the vote.

**17.** The depressed socio-economic condition of Bleckley County blacks *is reflected in circumstances such as the low level of blacks with high school educations, the lack of telephones and automobiles in black homes, the low per capita and family incomes of blacks, and the relatively large percentage of blacks living below the federally recognized poverty line.*

serving as a further barrier to active political participation by blacks, *id.* at 1563 n. 3. Moreover, the "personal preferences" of Bleckley County's citizens has resulted in racially exclusive organizations [18] in Bleckley County. These organizations, in turn, give blacks and whites in Bleckley County a different exposure to the candidates running for local, state, and national offices.

In its *Gingles* threshold analysis, the district court decided not to consider any of the evidence presented by the plaintiffs other than the presidential primary election data for 1984 and 1988. It discounted the value of that data and found it insufficient to establish racial bloc voting. The court also chose to discount the value of elections in the city of Cochran, with the possible exception of the successes of Willie Basby. Other evidence was neither considered nor discussed within the scope of the *Gingles* analysis because the court believed that it was prohibited from considering the evidence in evaluating the plaintiffs' compliance with the *Gingles* factors. These decisions were the crucial errors committed by the district court as a result of its misconception of the law.

■ When the evidence found in the record is analyzed within the proper legal framework, *i.e.,* the totality of the circumstances is reviewed for its impact upon the issue of racially polarized voting,[19] the evidence conclusively establishes a pattern of racially polarized voting in Bleckley County. Accordingly, the district court's conclusion that the *Gingles* factor requiring racial bloc voting was not satisfied in this case is clearly erroneous.

*(3) Existence of Political Cohesiveness*

■ Upon reviewing the record in this case, we also hold that the district court erred in concluding that Bleckley County lacks a politically cohesive black electorate. In reviewing this *Gingles* factor, the district court essentially committed the same error that it committed in analyzing the issue of racial bloc voting. That error was further compounded because the district court evaluated the existence of political cohesiveness after concluding that there was no racially polarized voting in Bleckley County. We have previously noted that "proof of racial polarization may ... be found sufficient by this Court to make the necessary finding of cohesiveness." *Stallings,* 829 F.2d at 1563 n. 15. Nonetheless, the record evidence and the specific factual findings of the district court, coupled with the existence of racially polarized voting, conclusively reveal that the *Gingles* requirement of political cohesiveness has been satisfied.

*C. Violation of § 2 in Bleckley County*

■ The district court not only erred in its legal analysis of the *Gingles* threshold factors, but it also erred in its "brief" final analysis of the plaintiffs' § 2 claim. That final analysis of the plaintiffs' claim under the totality of the circumstances, undertaken despite the court's conclusion that the *Gingles* factors had not been met, was seriously flawed. The flaw resulted from the premise upon which the district court operated: that the three *Gingles* factors had not been satisfied and were, in fact, unsupportive of the plaintiffs' case.

However, we find that the plaintiffs satisfied the *Gingles* test. At a minimum,

---

**18.** These organizations are mostly churches, civic clubs, and social clubs. The record reveals that these generally segregated organizations frequently serve as forums for political candidates and political discourse.

**19.** We stress that evidence of the totality of the circumstances is normally relevant at this threshold stage of the proceedings only insofar as it presents evidence bearing on the *Gingles* factors. The other Senate Report factors will not assist plaintiffs in meeting the necessary preconditions simply because they are found to

exist in a particular case. *Gingles,* 478 U.S. at 49 n. 15, 106 S.Ct. at 2765 n. 15. At this threshold stage, their importance is derived solely from the supportive, synergistic effect that they lend to the determination of the *Gingles* factors. However, where the challenged electoral system entirely forecloses the gathering of evidence bearing directly on the *Gingles* factors, courts must rely on other factors establishing unequal access to the political process, even though the *Gingles* factors cannot be proven. *Id.* at 57 n. 25, 106 S.Ct. at 2769–70 n. 25.

satisfaction of the three *Gingles* factors shifts the burden to defendants to offer rebuttal evidence. *See Solomon,* 899 F.2d at 1035 (Tjoflat, C.J., specially concurring). No meaningful rebuttal evidence was offered, and the totality of the circumstances found in Bleckley County clearly reveal a situation where the electoral power of Bleckley County blacks has been abridged "on account of race or color." Accordingly, the district court erred in its ultimate conclusion that the plaintiffs had not proven their § 2 claim.

Having concluded that the district court erred in failing to enter judgment for the plaintiffs, we REVERSE the district court and REMAND for the imposition of a remedy.[20]

---

**20.** To facilitate the devising of such a remedy in the district court, we would point out the apparent success of the Bleckley County school board districts as implemented by Georgia law and the consent decree entered earlier in this case. The remedy for the system challenged in this case could well be modeled after that plan, taking into account the particular problems and concerns of Bleckley County, as well as the requirements of the Voting Rights Act.