United States Court of Appeals,

Eleventh Circuit.

No. 95-8374.

E.K. HALL, Sr., Rev.; David Walker; U.S. Donalson; Richard Harris; Willie Aates; Wilson C. Roberson, Rev.; NAACP Chapter of Cochran, Bleckley County, Plaintiffs-Appellants,

v.

Jackie HOLDER; Robert Johnson; Charles Killebrew; Lonnie Barlow; Ben Jessup; C.C. Crooms; Willie Basby; Billy Ray Godfrey; T.C. Greer; William J. Lucas; Freddie White; Wayne Rogers; Wayne Tripp; Sonja Curtis; J. Larry Williams, Defendants-Appellees.

July 8, 1997.

Appeal from the United States District Court for the Middle District of Georgia. (No. 5:85-00242-2-MAC(WDO), Wilbur D. Owens, Jr., Judge.

Before EDMONDSON, Circuit Judge, and KRAVITCH and HENDERSON, Senior Circuit Judges.

KRAVITCH, Senior Circuit Judge:

Bleckley County, Georgia has had a single-commissioner government since its creation in 1912. In this case, we must decide whether such a system violates the equal protection rights of African-American citizens by diluting their ability to vote. We hold that the governmental structure was neither enacted nor maintained with a discriminatory purpose. Thus, we affirm the district court.

I.

This case has a long procedural history. Several black citizens filed suit in 1985, alleging that Bleckley County's single-commissioner government diluted their voting strength in violation of section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the Equal Protection Clause of the Fourteenth Amendment.[1] Consequently, they sought a court order creating a multi-member commission, with the members elected from single-member districts.

The district court ruled that the existing voting scheme satisfied § 2, as interpreted in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). It also held that

---

[1]Appellants advanced several other claims before the district court, but these were resolved by consent decree. Only the challenges to the single-commissioner government proceeded on appeal.

appellants did not state a constitutional claim, having "failed to provide any evidence that Bleckley County's single member county commission is the product of original or continued racial animus or discriminatory intent." *Hall v. Holder,* 757 F.Supp. 1560, 1571 (M.D.Ga.1991).

A panel of this court reversed. It concluded that the district court's factual determinations that Bleckley County voting was not racially polarized and that black citizens were not politically cohesive were clearly erroneous. *Hall v. Holder,* 955 F.2d 1563, 1569-74 (11th Cir.1992). In light of these conclusions and other trial evidence, it held that the single-commissioner government violated § 2, and enjoined further elections for commissioner until the district court fashioned an appropriate remedy. Having decided the statutory issue, the panel bypassed the constitutional question. *Id.* at 1567 n. 6.

The Supreme Court reversed. A plurality of the Court reasoned that it was impossible to assess dilution in this case because there was no readily identifiable alternative government to which Bleckley County's system reasonably could be compared. *Holder v. Hall,* 512 U.S. 874, 878-82, 114 S.Ct. 2581, 2585-86, 129 L.Ed.2d 687 (1994). In view of the wide range of government sizes in Georgia, the plurality held that "[t]here is no principled reason why one size should be picked over another as the benchmark for comparison." *Id.* at 881, 114 S.Ct. at 2586. The Court remanded to this court for resolution of the constitutional issue, and, in turn, we remanded to the district court to enable it to consider the potential effect on the equal protection issue of the Supreme Court's decision. The district court reaffirmed its prior order, stating that it saw no reason to "revisit" the equal protection issue, and appellants filed a timely appeal.

Subsequently, several registered Bleckley County voters moved to intervene in the suit, seeking dissolution of the prior injunction barring future elections and requesting that we order a special election. The movants assert that the injunction was issued to help remedy the § 2 violation, but that the Supreme Court's decision on the § 2 issue mooted the injunction. They further allege that the county has held no elections for commissioner since 1988; the 1992 election was stayed by this court and the 1996 election was not held apparently because the injunction had not been dissolved.

II.

Bleckley County was carved out of Pulaski County in 1912. The racial composition of the county is 22% African-American, 77% white, and 1% other. Since its creation, Bleckley County has been governed by a single commissioner, chosen every four years in an at-large county-wide election. Voting is racially polarized in Bleckley County. Although the district court found insufficient evidence of bloc voting, this court previously concluded that minority candidates' lack of success and, indeed, lack of candidacy, together with significant non-expert trial evidence that white Bleckley Countians would not vote for a black candidate, supported a finding of racial polarization. *See* 955 F.2d at 1571 ("The individual and collective experiences of these black leaders reveal that, as a practical political matter, blacks are unable to sponsor candidates for Bleckley County's sole commissioner office because such candidacies are futile.").[2]

According to appellants, the foregoing facts—an overwhelming white majority that votes as a bloc and the single-member nature of the office—combine with the mechanics of the election process and Bleckley County's past discrimination against black citizens to compel the conclusion that the single-commissioner office was conceived and is retained with a racially invidious purpose. Noting that a constitutional cause of action required proof of an intent to discriminate, *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the district court found no equal protection violation because there was no direct evidence of intent. 757 F.Supp. at 1569.[3]

We conclude that the district court circumscribed its review of the trial evidence too

---

[2]Although the Supreme Court reversed this court, its resolution of the legal issue left undisturbed our factual ruling.

[3]With respect to the creation of the single member office, the district court held that there was no evidence of an intent to discriminate because the plaintiffs had not adduced proof similar to that present in *Carrollton Branch of N.A.A.C.P. v. Stallings,* 829 F.2d 1547 (11th Cir.1987), *cert. denied,* 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988), where the sponsor of legislation reinstating the single-member commission in Carroll County previously had championed a white primary bill. Additionally, the district court held that there was no evidence of racial animus in the maintenance of the single-commissioner system because it had not been justified publicly in racist terms during a period when racial appeals were commonplace and because race played no apparent role in a 1986 referendum on whether or not the single-member system should be maintained. As discussed *infra,* we agree with the district court that the lack of such evidence is relevant; we simply do not view it as dispositive.

narrowly. The kind of proof demanded by the district court is, obviously, the most useful in an equal protection challenge; however, it is rarely the case that those with intent to discriminate will announce their purpose. Consequently, the Supreme Court repeatedly has stressed that intentional discrimination can be inferred from the circumstances surrounding the challenged governmental action, where the facts are sufficiently compelling. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."); *Davis* at 242, 96 S.Ct. at 2048-49 ("an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another").[4]

Voting rights cases are amenable to a circumstantial proof approach. In *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), the Supreme Court affirmed the lower courts' conclusions that Burke County, Georgia's system of electing its Board of Commissioners at large was maintained with a discriminatory purpose. Even absent direct evidence of intent to dilute minority votes, the Court found that the courts below properly considered the extensive circumstantial evidence of illegal purpose. It specifically endorsed the district court's consideration of the factors outlined in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973), *aff'd on other grounds sub nom., East Carroll Parish Sch. Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam), but also noted that the district court rightly did not confine its analysis to those factors. Rather, the trial judge considered all relevant evidence of intent, consistent with the dictates of prior cases, particularly *Arlington Heights. Lodge*, 458 U.S. at 618-23, 102 S.Ct. at 3276-78.

*Lodge*'s endorsement of both *Zimmer* and *Arlington Heights* provides a list of factors which, although not exclusive, are instructive in any equal protection voting rights challenge. The *Lodge* Court viewed the following *Zimmer* factors as relevant to discriminatory intent: (1) minority access to any candidate selection ("slating") process; (2) the degree to which government officials are

---

[4]*See also McCleskey v. Kemp,* 481 U.S. 279, 298 n. 20, 107 S.Ct. 1756, 1770 n. 20, 95 L.Ed.2d 262 (1987) (applying *Arlington Heights* ); *United States v. Byse,* 28 F.3d 1165, 1169 (11th Cir.1994) (same), *cert. denied,* 513 U.S. 1097, 115 S.Ct. 767, 130 L.Ed.2d 663 (1995).

responsive to minority needs; (3) the justification for the electoral system; (4) past discrimination and its effect on present-day political participation; (5) the size of electoral districts; (6) the existence of a majority-vote requirement; (7) in elections for multi-member offices, whether single-shot voting is permitted; and (8) the existence of geographic subdistricts. at 623-27, 102 S.Ct. at 3279-80. The *Lodge* Court also found that three other facts "bear heavily on the issue of purposeful discrimination," including: (9) the percentage of minority citizens and voters in the jurisdiction; (10) racial polarization in voting; and (11) the degree of minority electoral success. *Id.* at 623, 102 S.Ct. at 3278-79. Additionally, after *Lodge,* courts must heed *Arlington Heights* 's attention to legislative and administrative history when evaluating a challenged electoral system, and pay particular attention to the circumstances surrounding a particular decision and deviations from the normal decision-making process. *See Reno v. Bossier Parish Sch. Bd.,* --- U.S. ----, ---- - ----, 117 S.Ct. 1491, 1502-03, 137 L.Ed.2d 730 (1997) (noting applicability of *Arlington Heights* in voting dilution cases).

Because the district court did not make the requisite searching inquiry into the facts attending the adoption and maintenance of the single-commissioner system, we do not accord its ultimate factual determination—that no discriminatory intent existed—our ordinary deferential review under the clearly erroneous standard. *See Rogers* at 621-23, 102 S.Ct. at 3278 (district court findings regarding discriminatory intent reviewable for clear error). We will, however, defer to the trial court's subsidiary findings of fact about the conditions prevailing in Bleckley County, "representing as they do a blend of history and an intensely local appraisal of the design and impact of the [challenged political system] in the light of past and present reality, political and otherwise." *White v. Regester,* 412 U.S. 755, 770, 93 S.Ct. 2332, 2341, 37 L.Ed.2d 314 (1973). Based on these findings and the record on appeal, we undertake our own plenary inquiry into the question of discriminatory intent. We do so rather than remand for the district court's ruling because the record is complete[5] and provides an adequate basis for the conclusion that no discriminatory intent existed.

---

[5]The district court considered both a § 2 claim and a constitutional claim. The evidence relevant to determining whether a discriminatory impact exists under § 2 overlaps substantially with the evidence deemed important in *Lodge.* In giving the plaintiffs wide latitude to "make a

*See Watkins v. Bowden,* 105 F.3d 1344, 1354 n. 17 (11th Cir.1997) (appellate court may affirm district court on any ground, even one not considered); *Tejada v. Dugger,* 941 F.2d 1551, 1555 (11th Cir.1991), *cert. denied,* 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992) (remand unnecessary where issues can be understood fully and the record contains sufficient basis for appellate consideration of the merits of the case). Because this case has been litigated for twelve years, we resolve the remaining issue in the name of judicial economy.

### III.

Appellants argue that the single-commissioner system was conceived with racial animus, but only relegate this claim to a footnote in their appellate brief. Our own review of the trial record reveals no evidence of discriminatory intent in the creation of the single-member commissioner position in 1912. Plaintiffs presented no direct evidence of purpose whatsoever. Moreover, the circumstantial evidence introduced suggests no improper motive. Plaintiffs' expert witnesses testified that, at the time Bleckley County was created, black citizens were effectively disenfranchised via explicitly racist means, such as the white primary. Like the district court, we find it unlikely that, given the near-total *de jure* exclusion of blacks from the political process, that the Georgia legislature hatched a secondary, secret plan to create a government that would work to blacks' disadvantage once they became able to participate.[6] *See* 757 F.Supp. at 1562.

The only evidence of original discriminatory intent to which appellants point is Bleckley County's racist past. Appellants suggest that the enactments of Georgia's 1912 segregationist legislature are "tainted by racial motivation," Appellants' Br. at 28 n. 6, but the historical background for a given decision is only one factor relevant to intent. It does not, by itself, compel us to find a

record" on their § 2 claim, the district court necessarily received evidence relevant to the constitutional issue. *Cf. Velasquez v. City of Abilene,* 725 F.2d 1017, 1020 (5th Cir.1984) ("We see no reason why, in voting dilution cases, in light of the interrelated standards, a trial court cannot consider both the constitutional and statutory claims together.").

[6]For example, in a challenge to a system requiring at-large election of city commissioners, the Fifth Circuit rejected the argument that the system was created with invidious purpose because only 66 blacks lived in the city at the time the system was enacted. *See Jones v. City of Lubbock,* 727 F.2d 364, 371 (5th Cir.1984) ("the notion that the [officials creating the electoral system] concerned themselves with adding a superfluous means of ensuring black political powerlessness appears implausible").

discriminatory purpose behind every statute passed during regrettable periods of Georgia's past. As the Supreme Court has stated, "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *City of Mobile v. Bolden,* 446 U.S. 55, 74, 100 S.Ct. 1490, 1503, 64 L.Ed.2d 47 (1980) (plurality opinion). Thus, we find no racial animus, and, therefore, no equal protection violation, in the adoption of the single-commissioner system.

IV.

Turning to the maintenance of the single-commissioner system, appellants did adduce significant evidence at trial that is relevant to intent under a circumstantial proof regime. We examine this evidence below, applying the *Lodge* /*Arlington Heights* framework previously articulated.

No formal process exists in Bleckley County by which slates of candidates are selected and endorsed for election. Appellants' theory at trial, however, was that an informal slating process occurs in local social clubs, virtually all of which are segregated on the basis of race. This theory was not borne out by the trial evidence, even though some elected officials (including Jackie Holder, the current sole commissioner) are members of clubs whose membership does not reflect Bleckley County's racial diversity. It is apparent that some all-white clubs have held events permitting candidates to speak, and that black candidates have not been invited to participate. Nevertheless, there is no evidence that these events serve to winnow out candidates and the evidence is uncontroverted that none of these groups endorse particular candidates. Thus, the district court's conclusion that no slating process exists, *see* 757 F.Supp. at 1564, is not clearly erroneous.

White elected officials in Bleckley County are marginally responsive to the needs of the minority electorate. An official is responsive if he/she ensures that minorities are not excluded from municipal posts, evenhandedly allocates municipal services, and addresses minority complaints. *Lodge* at 625-27, 102 S.Ct. at 3280. First, in hiring, county officials were previously unresponsive but have made progress. In response to threatened withdrawal of federal funds in the 1970s, minorities were appointed to most county boards and commissions and continue to serve. Blacks,

however, remain severely underrepresented among election workers in the county.[7]  Second, municipal services are not allocated in a race-based fashion.  Appellants made vague accusations at trial that roads near black churches were not paved and indicated that some black residents sued in 1978 for alleged discrimination in the provision of services.  The evidence showed, however, that Holder has provided requested services;  for instance, he obtained, at black citizens' request, a county transit bus and accommodated a black resident's request for a street sign.  The defendants also elicited testimony indicating that roads were paved depending on their use and that Holder campaigned in 1976 in part on a promise of non-discrimination in road work.  Third, it appears that the commissioner is accessible to black constituents.  He has advertised and held monthly public meetings to solicit citizen input on county budget and policy decisions.  The district court's finding that the evidence does not "show that defendant Holder or the county commissioner's office, as structured, are unresponsive to the particularized needs of the black community in Bleckley County," therefore, is not clearly erroneous.  757 F.Supp. at 1564.

Bleckley County has a strong, color-blind justification for retaining the single-commissioner system.  With slightly over 10,000 residents, the need for an enlarged bureaucracy is minimal.  Moreover, expanding the size of county government is potentially costly.  Holder, who has campaigned actively to retain the single-commissioner system, has argued publicly that a single-person government is cheaper and able to respond to citizen needs more quickly.  Similarly, Cochran City Councilman Willie Basby, an African-American, stated that "[l]arger counties obviously need a commission, but one person could be good for small counties if he's an active man and deals with all the people."  Pl. Exh. 41.  Appellants' trial evidence did not refute this justification;  indeed, their expert admitted that efficiency was a common reason cited for retaining the single-commissioner system.  We therefore agree with the trial court:  "[t]he evidence does not show that the sole commission form of government for Bleckley County has been retained for tenuous reasons."  757 F.Supp. at 1564.

---

[7]Trial evidence showed that from 1978-1986, only six percent of 509 election clerks were black and none of the 224 poll managers were black.

Bleckley County's history parallels Georgia's retrenchment against federal civil rights legislation and court decisions. The district court found:

> 8. Until the Civil Rights Acts of 1957, 1960, 1964 and 1968 were passed by Congress and enforced by federal authorities, Bleckley County, in common with state and local government throughout much of the United States, enforced racial segregation in all aspects of local government—courthouse, jails, public housing, governmental services—and deprived its black citizens of the opportunity to participate in local government. After the Civil Rights Acts, segregation ended and is today no longer imposed by government.

> 9. *Brown v. Board of Education* ... ordered an end to segregated public schools. From the 1950's until around 1970, there was great public debate and discussion of desegregation, not just of public schools but of all public places. Candidates for public office during those years appealed for voter support by promising to oppose desegregation, but that practice ceased in the mid to late 1960's in Georgia and Bleckley County.

757 F.Supp. at 1562. These findings are manifestly correct,[8] and, as a consequence, black citizens of the county today suffer lingering socio-economic and political disadvantages as compared with their white neighbors. For example, the district court found that black citizens of Bleckley County are less educated and poorer than whites and that their socio-economic status "hinders the ability of and deters black residents ... from running for public office, voting, and otherwise participating in the political process." *Id.* at 1563. This conclusion is not clearly erroneous and is important evidence relevant to intent.[9]

The size of Bleckley County diminishes black political influence. As the county is 219 square miles in area, African-American candidates suffer because they are less likely to have access to transportation to enable them to speak with voters. *See id.* at 1563 n. 3. Furthermore, because there is only one polling place in the county, black constituents are less able to get to the polls to

---

[8]We are concerned, however, at the willingness of certain defendants to paper over the county's well-documented history of segregation. Defendant Johnson, the county Probate Judge, is noteworthy: "Q: So as far back as you know, going back to as far as you can remember, you can't remember of a single place in the county that was ever segregated on the basis of race or where blacks were not permitted to go? A: Not that I know of." Johnson Dep. at 19.

[9]Without proof of the lingering effects of discrimination, Bleckley County's history would be only marginally relevant. *See McCleskey v. Kemp,* 481 U.S. 279, 298 n. 20, 107 S.Ct. 1756, 1770 n. 20, 95 L.Ed.2d 262 (1987) ("unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value").

elect candidates of their choice.[10]

The mechanics of Bleckley County elections do not significantly aid our inquiry into discriminatory purpose. Because there is only one county commissioner, single-shot voting is impossible and geographic subdistricts are of no use; thus, those *Lodge* factors are irrelevant. Additionally, until 1994 Georgia law required a runoff where a primary or general election candidate only garnered a plurality of the votes[11] and appellants introduced evidence that this statewide requirement was enacted with a discriminatory purpose.[12] We disagree with the district court that this state-imposed statute is irrelevant to county officials' intent, 757 F.Supp. at 1571, because the Supreme Court considered the same statute in *Lodge.* at 625-27, 102 S.Ct. at 3280. The existence of this majority-vote statute, however, is only slightly probative as to Bleckley County officials' aim in maintaining the single-commissioner system; trial evidence revealed that the county representative voted against the majority-vote requirement when it was first proposed in 1963 and had died when it passed in 1964.[13] Additionally, no black candidate in the county has ever been

---

[10]Appellants contend that the particular polling place chosen exacerbates the problems posed by the voting precinct's size. Bleckley County voting is held at the Jaycee Barn, and evidence indicates that the local Jaycees have no black members. One trial witness claimed that, as a result, many blacks (though he did not name any) would not vote there. Significant other testimony indicated that the location was convenient for black voters; it is located near a predominantly black area in Cochran, and several African-American witnesses testified that the Jaycees' membership did not deter them from voting. We do not draw any inference from this conflicting proof.

[11]The law, O.C.G.A. § 21-2-501, was amended in 1994. It now requires a majority vote to prevail in the primary, but a plurality to carry the general election. 1994 Ga. Laws 774.

[12]Representative Denmark Groover made racial appeals in introducing the majority vote bill and Floor Leader Frank Twitty endorsed the measure because plurality elections were likely to lead to the election of a black in counties where minority population was high.

[13]The county's Democratic Executive Committee adopted a local majority-vote requirement prior to the state statute's enactment. Appellants claim that these politicians knew the likely discriminatory effect of a majority-vote provision. We agree that this fact is somewhat relevant to county officials' attitude circa 1964, but believe that the county representative's "no" vote the previous year indicates a diversity of opinion. Moreover, it is interesting to note that both Bleckley County representatives voted in favor of the 1994 measure to scale back the majority-vote statute. 1994 Ga. Journal of the Senate 1694; 1994 Ga. Journal of the House 2002.

defeated by a majority after winning a plurality.[14]

The greatest impediment to black Bleckley Countians' political success is the fact that they constitute a substantial electoral minority and that county voting is racially polarized. Racial bloc voting by the white majority usually suffices to keep black citizens out of office. Rejecting the district court's analysis, this court previously held that the limited statistical evidence and substantial non-statistical evidence of community polarization in Bleckley County compelled the conclusion that county voting occurred along racial lines. 955 F.2d at 1571.

Minorities have had virtually no electoral success in Bleckley County, likely because of polarized voting. No black has ever won a county-wide at-large election. Indeed, even in Cochran, where minorities constitute a more substantial percentage of the population, only one black candidate has prevailed in an at-large election for City Council, whereas others who have run have failed.[15] Only since the county school board changed to geographic electoral subdistricts, one of which is majority-minority, has a black, Reverend Hall, been elected. Appellees blame the lack of black candidates for the lack of black results, given that only Hall has run for a county-wide at-large position (Probate Judge) and no black candidates have offered for sole commissioner. We, however, agree with our prior panel: black candidates are rare because "it is next to impossible for a black candidate to win an at-large county-wide election in Bleckley County...." 955 F.2d at 1571.

The legislative and administrative history of Bleckley County's maintenance of the sole commissioner system is compelling evidence of a race-neutral intent. First, appellants can point to no direct evidence (i.e., overt racial appeals) of discriminatory purpose with regard to this particular office. Like the district court, we note that if racial reasons underlay the maintenance of the single-commissioner system, public discussion of the system in the years preceding the Civil Rights

---

[14]We recognize that majority-vote requirements can be benign alone but dilutive when combined with bloc voting by the white majority. We have considered the synergistic effects of these facts about Bleckley County in our conclusion above.

[15]David Walker ran three times for City Council and lost each time to a white opponent. Mattie MacDonald also lost to a white adversary. Only City Councilman Basby, whose personal cross-over support was noted previously, 955 F.2d at 1572 n. 16, has been elected at large in Cochran.

Acts likely would have been racially charged.  *See* 757 F.Supp. at 1570.  We consider the absence of such evidence persuasive.

Additionally, there is no circumstantial evidence relevant under *Arlington Heights* that suggests an improper motive.  Bleckley County government was the subject of significant public wrangling throughout the 1970s and 1980s:  (1) the county grand jury made numerous recommendations from 1975 to 1983 that a multi-member commission be considered, but it eventually concluded that it was not worth changing;  (2) the county adopted a system in 1982 for electing school board members from geographic subdistricts, rather than having the grand jury appoint them;  (3) in 1984, a black representative of the Atlanta-based Voter Education Project approached Holder and requested that he change the system, threatening suit otherwise, and Holder took no action;  and (4) in 1986, pursuant to authorization from the state legislature, Bleckley County held a referendum on maintaining the single-member system and the measure failed by a vote of 1,156 to 887.  Notably absent from these political struggles was any organized minority support for a particular government form or a suggestion that black citizens were better served by multi-member county boards elected from geographic subdistricts.[16]  In particular, there is no evidence that the 1986 referendum on the single-commissioner system was racially polarized; according to expert testimony, the referendum was motivated by an increase in the local tax rate. Moreover, only twenty-five percent of registered blacks voted on the measure, trial evidence showed that the "voters did not perceive the referendum to be a black versus white issue," 757 F.Supp. at 1563, and at least one-third of whites voted to change to a multi-member board.[17]  Appellants also

---

[16]First, Frank Scarborough, a white Republican who preceded Holder as sole commissioner, was elected in 1972 while advocating a move to a multi-member commission.  Second, there is no evidence in the record as to why the grand jury abandoned the idea of going to a multi-member commission, but appellees' expert interviewed some surviving members who thought the decision was fiscally-motivated.  Third, the Voter Education Project suit apparently never attracted enough public interest to materialize.  Fourth, the decision to elect the school board from geographic subdistricts was motivated by citizens' desire for popular elections, rather than appointment by the grand jury.

[17]296 blacks voted on the referendum.  Even if every black voter wanted to change the system, the remaining 591 votes to abolish the single commissioner would have been whites. This figure is 34% of the total number of whites voting (1,747).

point to no procedural departures from the ordinary policy-making process in the decision to maintain the system; that is, they do not argue that the referendum was somehow deficient. Although appellants contend that the single-commissioner system is rare in Georgia, and therefore a substantive departure relevant to intent, it is uncontested that approximately twenty other counties continue to use this form of government.

In sum, we have considered the full range of circumstantial evidence of racial animus adduced at trial regarding the maintenance of the sole commissioner and conclude that it is lacking. Certain facts are naturally compelling; specifically, that the county's white majority tends to vote as a bloc, excluding blacks from public service, and that black citizens are placed at a political disadvantage by the socio-economic remnants of official segregation. Such evidence, however, does not equal discriminatory intent, especially given countervailing facts such as the absence of a formal candidate slating process and the relative responsiveness of county officials. Nor does appellants' evidence outweigh the strong proof adduced in this case that Bleckley County has decided to maintain its single-commissioner system for legitimate, non-discriminatory reasons and has made this particular decision in a non-racial political climate.

V.

Several Bleckley County voters seek to intervene in this appeal, asking us to dissolve a 1992 injunction of this court and requesting that we order immediate special elections to be held. When this court held in 1992 that Bleckley County's system violated the Voting Rights Act, it also granted a motion staying the commissioner election, pending entry of an appropriate remedy by the district court. The Supreme Court reversed our Voting Rights Act decision in 1994, in effect mooting the injunction. Notwithstanding this fact, Bleckley County officials did not hold a 1996 election for commissioner because of the injunction. This plainly misread the import of this court's order; we make clear today that the injunction is (and has been) dissolved.

Permitting intervention and assessing the propriety of a special election at this late stage, however, is inappropriate. "A court of appeals may, but only in an exceptional case for imperative reasons, permit intervention where none was sought in the district court." *McKenna v. Pan*

*American Petroleum Corp.,* 303 F.2d 778, 779 (5th Cir.1962). The movants assert that this case is exceptional because elections have not been held in nine years and claim that relief is imperative because they are being denied their right to vote. Nevertheless, federal court intrusion into state electoral processes is disfavored without a compelling justification, *see Curry v. Baker,* 802 F.2d 1302, 1314 (11th Cir.) ("federal courts will not intervene to examine the validity of individual ballots or supervise the administrative details of a local election"), *cert. dismissed,* 479 U.S. 1023, 107 S.Ct. 1262, 93 L.Ed.2d 819 (1986), and hesitation is especially called for when an appellate court lacks the facts necessary to enable it to weigh the equities of injecting itself into a local dispute. *Cf. Taylor v. Monroe County Bd. of Supervisors,* 421 F.2d 1038 (5th Cir.1970) (remanding for district court to entertain motion for immediate election and to consider time and effort necessary to hold election expeditiously).[18] We therefore decline to exercise our discretion to permit the movants to intervene at this stage of the litigation.

## VI.

Accordingly, the judgment of the district court is AFFIRMED. The motion to intervene is DENIED.

EDMONDSON, Circuit Judge, concurring:

I concur in today's judgment. And, I agree that markedly insufficient evidence exists in this record to show the racially discriminatory intent which is essential to establish an equal protection violation. (By the way, the record does show that about 70% of both blacks and whites in the county are now registered to vote.)

I write chiefly to point out that, in the light of *City of Mobile v. Bolden,* 446 U.S. 55, 76-77,

---

[18]The right to vote is concededly a right of paramount constitutional significance, the violation of which permits federal court intercession. Movants have not, however, articulated how the particular conduct at issue here—not holding the 1996 election—violates this right. *See, e.g., Duncan v. Poythress,* 657 F.2d 691, 703 (5th Cir. Unit B Sept.1981) (state election practice violates due process and warrants federal intervention if it involves " "patent and fundamental fairness' "), *cert. dismissed,* 459 U.S. 1012, 103 S.Ct. 368, 74 L.Ed.2d 504 (1982). Also, the facts supporting appellees' claim that the next commissioner election can be held more efficiently during the 1998 election cycle have yet to be proven. Thus, we cannot assess the propriety of a special election at this time. This is not to say that the movants cannot pursue their rights in a separate proceeding. We conclude only that the pleadings before us are insufficient.

100 S.Ct. 1490, 1505, 64 L.Ed.2d 47 (1980), whether long-established, single-member districts are subject at all to equal protection challenges based on a dilution theory seems doubtful. Given the weak evidence of discriminatory intent in this case, however, *Bolden* did not need to be interpreted or stressed.